THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLIFFORD JACKSON, Defendant-Appellant.

(No. 59870; ▮▮▮▮▮)

First District (4th Division)—February 13, 1975.

Paul Bradley and Martin Carlson, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

Clifford Jackson was charged with the offense of murder in an indictment which alleged that, on August 29, 1972, he beat and killed Nina Ozier with an iron pipe. Following a jury verdict of guilty, Jackson

was sentenced to a term of not less than 30 nor more than 90 years in the penitentiary.

On appeal, the defendant raises several issues for review. Because the case must be reversed and remanded for a new trial, we deem it necessary to discuss only the following questions:

(1) Whether the admission into evidence of the hearsay statement of the deceased's 4-year-old granddaughter was error;

(2) Whether the court erred in its response to a request by the jury to review the transcript of the trial; and

(3) Whether the giving of a deadlock instruction to the jury by the court was reversible error.

The testimony adduced at trial may be summarized as follows: The first witness called by the State was Mrs. Wanda Haynes, the daughter of the deceased. Mrs. Haynes testified that Nina Ozier had lived with the defendant off and on for 6 or 7 years prior to August 29, 1972, but on that date was living with her. According to the witness, the deceased left the apartment early on the morning of August 29 to go to work, accompanied by her 4-year-old granddaughter, Alicia. Mrs. Haynes testified that the next time she saw her mother was the following morning at the County Morgue and that her mother was dead. Further, Mrs. Haynes stated that the next time she saw her daughter, Alicia, was about 1 A.M. on August 30, 1972, when three police officers brought the child home. The following exchange then took place between the prosecutor and the witness:

"Q. And when you saw your daughter what was the first thing that she said to you?

A. She said that grandmother was dead. That, 'Granddaddy Clifford hit her with a big stick and she fell.' "

An objection to this testimony was overruled, and Mrs. Haynes stated that the person her daughter referred to as "Granddaddy Clifford" was the defendant, Clifford Jackson. On cross-examination, Mrs. Haynes stated that she had seen Clifford Jackson and her mother together quite often and that Mr. Jackson's treatment of the deceased was "very cruel." The witness further testified that her mother was about 5 feet 7 inches tall and weighed about 190 pounds.

The State's next witness was Chicago policeman Alex Kaider. The officer testified that, shortly after 9 P.M. on August 29, 1972, he and his partner were sitting in their squad car at the intersection of Warren and Sacramento Streets when they observed Clifford Jackson, Nina Ozier, and a female child standing on the corner. Kaider testified that he observed the defendant slap Mrs. Ozier on the face. When Kaider asked

what the problem was, Jackson replied that his wife was intoxicated and he was trying to get her home. Kaider further testified that, in order to quell the disturbance, he and his partner drove the woman and the child to Jackson's car located at 3059 West Washington, where they met Jackson. The officer stated that Mrs. Ozier appeared to be intoxicated. According to Kaider, the woman fell onto the street as Jackson helped her get out of the car. Then, stated the officer, he helped Jackson pick her up and place her in a white automobile which Jackson stated was his. Thereafter, the officer and his partner left the area. Kaider further testified that he did not notice anything unusual about Jackson's appearance or clothing at that time.

Kaider then testified that, shortly after midnight on the same evening, he responded to a radio call regarding a disturbance and fight in an alley near 3059 West Washington. According to Kaider, Jackson was standing in a garage and upon seeing him said, "Hi officer, remember me?" Upon entering the garage, Kaider stated that he saw Mrs. Ozier lying on the floor alongside an abandoned automobile. Kaider testified that Mrs. Ozier's clothing was disheveled and bloodstained, her lips were swollen, and her face was bruised. The officer stated that there were also bloodstains on Jackson's shirt and some scratches about his face.

The State called Charlie Jones as its next witness. Jones testified that he lived in an apartment at 3035 West Washington Street and had known Clifford Jackson and Nina Ozier prior to the date of the incident. Jones testified that, between 9:30 and 10:30 P.M. on August 29, 1972, he went downstairs to a garage in the alley behind his apartment, where he saw Jackson standing by a car with Mrs. Ozier nearby. According to Jones, Jackson dragged Mrs. Ozier into the garage by her legs and asked her about some keys. Jones stated that Jackson then looked around the garage, found a piece of iron, and began to beat Mrs. Ozier with it. Jones identified People's Exhibit No. 5 as the iron pipe used by Jackson to inflict the beating. Jones stated further that Jackson stopped beating the woman from time to time and that he told Jackson two or three times to stop beating her. Jones testified that he did not see a child in the vicinity at that time.

According to Jones, he then left the garage and went upstairs to his apartment, where he remained for about 15 or 30 minutes. The witness stated that Jackson then called upstairs for him to hurry down to the garage, stating that he believed Nina Ozier was dead. Jones stated that he rushed down with a bucket of water, which Jackson used to wipe Mrs. Ozier's face. At this time, according to Jones, he saw a child, who was approximately 4 years old, sitting in Jackson's car. The witness stated

that the car was parked in front of the garage and the door was open. Jones further testified that he had seen Jackson beat Nina Ozier 5 or 6 times prior to the incident which led to her death.

On cross-examination, Jones testified that, when he first went downstairs, he saw Mrs. Ozier lying on the right-hand side of Jackson's car and that the defendant then dragged her into the garage by her legs. Jones' testimony before the grand jury on December 20, 1972, was then read into evidence, and he acknowledged that his earlier statement to the grand jury was that Jackson began beating the woman with the iron pipe immediately and did not drag her into the garage by the legs. Jones testified that he did not recall which hand Jackson used to strike Mrs. Ozier, but then demonstrated the manner in which the blows were delivered and concluded that Jackson used both of his hands. Jones further stated that he did not actually see the blows strike Mrs. Ozier's body because he was on the opposite side of the car, but later stated that they were delivered to the lower portion of her body in the rib area. The cross-examination of Jones further revealed that he did not remain in the garage throughout the beating but drove Jackson's car to a nearby liquor store where he purchased a half-pint of whiskey at Jackson's request. He then brought the liquor back to the garage and drank it along with Jackson. Jones stated that he subsequently drove to the liquor store a second time to buy more liquor. Jones' testimony on cross-examination was that the child accompanied him to the liquor store. Further, the witness stated that he did not tell anyone at the liquor store about the beating, that he thought about calling the police but did not, and that it was Jackson who asked that the police be called. On redirect examination, Jones testified that he did not attempt to stop the beating because Jackson and Mrs. Ozier had told him during fights on previous occasions not to interfere.

Chicago policeman William McCorkle, called as a witness for the State, testified that he and his partner arrived on the scene at approximately 11:55 P.M. in response to a call regarding a fight in the alley. He stated that they were flagged down by Clifford Jackson, who told them that he thought a woman was dead in the garage. The officer testified that he went into the garage, saw the decedent, and felt for a pulse. According to McCorkle, he noticed that she was stiff. McCorkle testified that Jackson replied "No" when asked if he knew her or if he knew anything about what had happened. The witness further stated that he recovered a wad of money near the head of the deceased and a large metal object, identified as People's Exhibit No. 5, at the rear of the garage resting against a window. According to McCorkle, Jackson's

clothing was in disarray, bloodstains were on his shirt, and some scratches were about his neck.

The State's next witness was Martha Wilson who stated that she was living with Charles Jones on August 29, 1972, and had known Clifford Jackson and Nina Ozier for about 3 months prior to the date of the incident. Ms. Wilson testified that she saw Jackson slap Mrs. Ozier about 2 weeks prior to the date of her death. Regarding the events of August 29, 1972, Ms. Wilson stated that Charles Jones left their apartment and went downstairs between 9:30 and 10:30 P.M. About 30 minutes later, Jones returned to the apartment but did not say anything about what had happened while he was away. The witness testified further that, about 15 or 30 minutes thereafter, Jackson called for Jones, who took some water from the apartment and went downstairs again.

Dr. Eugene Constantinou, a forensic pathologist, testified that he performed a pathological examination on Nina Ozier's body. The doctor stated that his external examination revealed bruises on the neck, face, chest and abdomen. His internal examination revealed blood in the tissues of the forehead, several broken ribs, and a punctured lung. The physician testified that in his opinion, the cause of death was extreme injuries to the head, neck and chest with the effect of fracture of the ribs and laceration of the lung. The witness testified that the injuries to the neck and face were caused by violence and could have resulted from blows by a fist, and that the rib fractures could have been caused by blows from a heavy metal object. Dr. Constantinou further testified that the injuries could not have been caused by a fall from an automobile seat to the ground.

The State's final witness was Mary Ann Mohan, a microanalyst for the Chicago Police Department Criminalistics Division, who testified regarding her analysis of various blood samples submitted to her. According to Ms. Mohan, the deceased had type A-B blood and this blood type occurs in about 3 percent of the population. The witness further stated that extracts of blood identified as having been taken from the floor of the garage, from a metal pipe (People's Exhibit No. 5), and from Clifford Jackson's clothing all contained type A-B blood.

Clifford Jackson testified in his own behalf as follows: On August 29, 1972, the witness was living alone in an apartment at 3045 West Washington Street in the city of Chicago. Jackson said that Nina Ozier had lived with him from 1963 to 1970, that he still maintained contact with her, and that occasionally she would spend the night or several days with him. Jackson stated that he had been employed as a mechanic and tow driver for 3 years prior to August 29, 1972, but did not work on

that date. According to Jackson, Mrs. Ozier called him twice on the date of the incident and asked him to pick her and her granddaughter up from the train station. Jackson stated that he could tell from her voice over the telephone that she had been drinking. Jackson testified further that he arrived at the train station about 6:30 P.M. and subsequently drove Mrs. Ozier and Alicia to a liquor store where Mrs. Ozier purchased a bottle of whiskey. According to Jackson, Mrs. Ozier finished the bottle and started walking back to the liquor store to get more, but he told her that she was too "high" to take the child. He further testified that he slapped Mrs. Ozier in order to get her loose from a fence she was holding onto, and it was at this point that a police officer came up to them and asked what was wrong. Jackson's testimony regarding what then occurred is consistent in all material respects with that of Officer Kaider, except Jackson stated that Mrs. Ozier was unconscious when he and the officers placed her in his car.

According to Jackson, he then drove his car into the alley near his apartment because Mrs. Ozier was too heavy for him to carry. After sitting in the garage for awhile, Jackson stated that he returned to the car in which Mrs. Ozier had been placed and found that she had fallen out of it—her head was on the ground in the alley and her feet were hooked around the corner of the car door. According to the witness, he then unhooked her feet, dragged her into the garage by holding her under the arms, and propped her against the front wheel of another car which was parked in the garage. Jackson testified that he then tried to wake Mrs. Ozier by shaking her and slapping her on the side of her face, and that she did regain consciousness.

Jackson stated further that Charles Jones came down to the garage shortly after he arrived and was present when he dragged Mrs. Ozier into the garage. After talking with Jones for awhile, Jackson stated that he asked Jones if he wanted a drink. Jones then drove Jackson's car to the liquor store and returned with a half-pint. After they drank the first bottle, Jones went back to the liquor store for more, accompanied on both trips by Alicia.

Jackson testified that he then left the garage and drove his car to the front of the apartment. Then, according to Jackson, he carried Alicia upstairs, put her to bed, and watched television during the 30 to 50 minutes that elapsed before the child fell asleep. Jackson stated that, when he left the apartment to go back to his car, he saw a man walking in front of him on Washington. Jackson suspected that the man might have bothered Mrs. Ozier, but then watched the unidentified man walk away. When Jackson arrived at the garage, he testified that Mrs. Ozier was no longer sitting in the position in which he had left her, that her

hand was limp, and that she was not breathing. Jackson then called for help and Jones came down. Jackson stated that he asked a neighbor to call the police while he put his arms around Mrs. Ozier and his face down to hers.

On cross-examination, Jackson testified that Alicia was fond of him and sometimes called him Grandpa Cliff; that he yelled at and slapped Mrs. Ozier on the night in question but did not hit her; that Jones never told him to stop hitting Mrs. Ozier but did say, "Don't slap her"; that Mrs. Ozier had struck him in the past and probably had caused his scratches; and that he and Mrs. Ozier had had disagreements in the past and he had struck her but never hard enough to cause bleeding.

The defendant's next witness was Sal Lena, who testified that Jackson had worked for him off and on for 3 years. Objections to Lena's opinion as to Jackson's reputation for truth and veracity were sustained. The defense then rested its case.

The first issue we shall discuss is the defendant's contention that the trial court erred in admitting the hearsay statement of Alicia, the 4-year-old granddaughter of the deceased. At trial the following colloquy occurred between Wanda Haynes, the daughter of the deceased and Alicia's mother, and the prosecutor:

> "Q. And when you saw your daughter what was the first thing that she said to you?
>
> A. She said that grandmother was dead. That, 'Granddaddy Clifford hit her with a big stick and she fell.'"

This testimony was admitted over objection.

During the course of the People's closing argument, the prosecutor reminded the jury of this statement on several occasions. The prosecutor addressed the jury as follows:

> "[Defense counsel] says there was but one eyewitness, Charles Jones. * * * That is not true, because there were two eyewitnesses. That small child witnessed this event as well. And the first person she reasonably could be expected to talk to about it she said what she saw: 'Gramma's dead. Grandpa Cliff hit her with a big stick. She fell down.'
>
> * * *
>
> There were two eyewitnesses: That little girl saw Clifford Jackson hit that woman with a big stick. Here is the big stick. (Indicating)."

The question we must decide in determining this issue is whether the child's statement to her mother was properly admissible under the "spontaneous declaration" exception to the hearsay rule. The classical rationale underlying this exception was summarized by Wigmore as follows:

"This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts." 6 Wigmore, Evidence § 1747, at 135 (3rd ed. 1940).

■■ In order for a statement to qualify as a "spontaneous declaration" or "excited utterance," three conditions must be met: (1) the occurrence must be sufficiently startling to produce nervous excitement in the declarant which renders the statement spontaneous and unreflecting; (2) there must be an absence of time between the occurrence and the statement in which the declarant could reflect and fabricate; and (3) the statement must relate to the circumstances of the occurrence. (*People v. Parisie* (1972), 5 Ill.App.3d 1009, 1027, 287 N.E.2d 310; 6 Wigmore, Evidence § 1950 (3rd ed. 1940); Cleary, Handbook of Illinois Evidence § 17.30 (2d ed. 1963).) At issue in this case is whether the second of the above conditions, the requirement of spontaneity or the lack of sufficient time to allow an opportunity for reflection and invention, was met.

The State urges that we should not be persuaded by the amount of time that elapsed between the occurrence and the statement but by the special circumstances involved herein, such as, the age of the child, the shocking nature of the occurrence, the absence of self-interest, and the fact that the statement was apparently made to the first familiar person encountered by the child after the incident. It relies heavily upon *People v. Parisie* (1972), 5 Ill.App.3d 1009, 1028, 287 N.E.2d 310, 320, wherein this court stated that spontaneity is a relative term and will vary under each set of circumstances.

After examining all of the circumstances in this case, we are not convinced that the statement in question was spontaneous. The first respect in which the spontaneity requirement was absent concerns the time at which the statement was made. At least 2 hours elapsed between the time the beating allegedly occurred and the time that the child

made the statement to Mrs. Haynes. The State's evidence established that the murder occurred between 10 and 11:30 P.M. on August 29, 1972, and Mrs. Haynes testified that the child's statement was made at 1 A.M.

In *People v. Jackson* (1956), 9 Ill.2d 484, 489-90, 138 N.E.2d 528, 531, the Supreme Court of Illinois found that statements made 1 hour after the occurrence were inadmissible, particularly where the statements were very prejudicial to the defendant. The court further stated that it had found no case where a statement made after a 1-hour interval of time had been considered spontaneous. Moreover, in *Perkins v. Culver* (1971), 131 Ill.App.2d 881, 885, 269 N.E.2d 333, 336, a statement made 1½ hours after the occurrence was held inadmissible.

The State cites *People v. Parisie* (1972), 5 Ill.App.3d 1009, 287 N.E. 2d 310, to support its argument that the substantial time lapse that occurred in this case did not disqualify the statement in question as a spontaneous declaration. In *Parisie* the declarant was the victim of a shooting who was found lying alongside a road, suffering from three bullet wounds and in a state of shock at the time the statement was made. The time interval between the shooting and the incident was not definitely established but "may have been more than one hour." The court held that, under these circumstances, the lapse of time did not render the statement inadmissible. In this case, there was no evidence that the child was in a state of physical or emotional shock when she made the statement in question. Thus, the circumstances in this case are dissimilar from those in *Parisie*.

In addition to the amount of time that elapsed, our review of the surrounding circumstances also supports the view that the element of spontaneity was lacking in this case. There is no evidence in the record to show that the child was in fact in a state of excitement when the statement in question was made. The child was in the custody of several police officers prior to being taken to her mother, and the record is devoid of any indication as to whether the child mentioned the beating to the officers or whether the statement in question was based on something she was told by one of them. Moreover, we believe that the defendant was prejudiced by the admission of the testimony and the prosecutor's repeated references to the statement during its closing argument.

■■ In our opinion, the substantial lapse of time between the occurrence and the statement, as well as the surrounding circumstances, rendered the hearsay statement inadmissible as a spontaneous declaration because the requirement of spontaneity was not met. Therefore, we hold that it was error for the trial court to admit the statement into evidence.

Secondly, defendant argues that the court erred in failing to exercise

its discretion when it responded to a request by the jury to review the testimony presented at trial. This objection is based on the fact that, sometime after the jury retired to deliberate, it sent out two questions to the court: (1) a request that the transcript of the trial be provided to it; and (2) qualified advice as to how long it takes rigor mortis to set in after a person is dead. The court answered in writing, denying both requests. The defendant takes issue with the trial court's denial of the jury request pertaining to the transcript of the trial proceedings.

In *People v. Pierce* (1974), 56 Ill.2d 361, 308 N.E.2d 577, the Supreme Court of Illinois adopted the view that it is within the trial court's discretion to allow or refuse a jury's request to review testimony and that there must be an abuse of this discretion in order for a reviewing court to set aside its ruling. The court also summarized the different approaches that have been taken with respect to a jury's request to review testimony as follows:

> "* * * [T]here are differing views on whether a trial judge upon a jury's request during its deliberations should permit a review of testimony that was presented during trial. Some have taken the position that where the requested testimony is directly material to the issues in the case the trial court must grant the jury's request. (E.g., *United States v. Jackson* (3d Cir.), 257 F.2d 41.) The view taken in the ABA Standards, Trial by Jury, section 5.2 (Approved Draft, 1968), is that the trial court is obliged to have the testimony read to the jury whenever the jury's request is reasonable, the determination of which, of course, involves an exercise of discretion. A third view is that it is within the discretion of the trial court to allow or refuse the request for the review of testimony. The majority of courts which have considered the question have adopted this view. (50 A.L.R.2d 176.) We consider that the position of the majority is to be preferred. The trial court will have a full knowledge of the case. It will know the charges against the accused, the witnesses and their supporting or defeating testimony and other evidence which may have been presented. It will be in a position to assess the request and judge whether a review of testimony, considering the circumstances, will be helpful or hurtful to the jury's proper deliberations. This question of review, like so many others which appear in the course of trial, is best entrusted to the trial court's sound discretion." 56 Ill.2d 361, 363-64.

In *People v. Queen* (1974), 56 Ill.2d 560, 310 N.E.2d 166, the supreme court found that the trial judge abused his discretion with respect to the jury's request to review testimony in view of the following facts. During

the jury's deliberations it sent a note to the trial judge requesting, "Would like the defendant's words on the stand." The court replied to the jury, "You must decide on the basis of the testimony heard in the courtroom. I cannot have any testimony of any witnesses read to you  *  *  *." The supreme court interpreted this response to the jury as a statement that it did not have discretion to consider the jury's request for a review of the defendant's testimony. The court stated:

> "There is error when a trial court refuses to exercise discretion in the erroneous belief that it has no discretion as to the question presented. (*People ex rel. Chesapeake and Ohio Ry. Co. v. Donovan*, 30 Ill.2d 178.)" 56 Ill.2d 560, 565.

Similarly, the record of the proceedings in the case before us leaves grave doubt in our minds as to whether the trial judge was aware of his discretion to grant the jury's request to review the testimony. The discretion envisioned by the court in *People v. Pierce* (1974), 56 Ill.2d 361, 308 N.E.2d 577, as indicated by the rationale for adopting the majority view, would enable the trial court to determine whether a review of the testimony would be helpful or harmful to the jury's proper deliberations. Here, the trial court failed to ascertain from the jury the specific testimony which it wished to review. If, upon inquiry, the jury in fact wished the entire transcript, the court could have properly refused the request in the exercise of its discretion. However, if the jury responded to the court's inquiry by indicating the specific testimony which it wished to review, the trial court would have been able to fulfill its duty of determining whether a review of the testimony requested would assist the jury in its proper deliberations.

The American Bar Association Minimum Standards, *Trial by Jury*, section 5.2(b), urged for approval by Justice Schaefer's dissenting opinion in *People v. Pierce* (1974), 56 Ill.2d 361, 365-66, 308 N.E.2d 577, 579, provides in pertinent part:

> "Whenever the jury's request is reasonable, the court, after notice to the prosecutor and counsel for the defense, shall have the requested parts of the testimony read to the jury and shall permit the jury to reexamine the requested materials admitted into evidence."

■■  We believe that the trial court's failure to make a preliminary determination of which testimony the jurors desired to have supports the view that the trial judge erroneously believed that he had no discretion with respect to the jury's request for a review of the testimony. Therefore, we hold that the trial court erred in failing to exercise discretion in responding to the jury's request to review the testimony presented at defendant's trial.

Finally, the defendant argues that the court's giving of a deadlock instruction was reversible error. After receiving its instructions from the court, the jury retired to begin its deliberations at 11:10 A.M. on February 9, 1973. At 9:20 P.M., the judge called the jury back into open court and asked the foreman if he thought the jury might be able to arrive at a verdict. The foreman responded: "Yes, sir, I do." The judge then gave the following deadlock instruction, over the defendant's objection:

> "THE COURT: Thank you. I am going to send you back. I just want to let you know that in a large proportion of cases absolute certainty cannot be expected. Although the verdict must be the verdict of each individual juror and not a mere acquiescence of conclusions of others, yet you should examine the question submitted with proper regard and deference to the opinions of each other and you should listen to each other's opinions with the disposition to be convinced.
>
> It is your duty to decide the case if you can conscientiously do so. If you should fail to agree on a vedict the case must be retired and a future jury must be selected in the same manner and from the same source as you have been chosen. And there is no reason to believe that the case would ever be submitted to twelve men and women more competent to decide. Nor can the case be tried any better or more exhaustively than it has been here or that more clear evidence could be produced on behalf of either side.
>
> Now, you can retire now and reconsider the verdicts in this case. Thank you."

Similar language can be found in *People v. Prim* (1972), 53 Ill.2d 62, 71-72, 289 N.E.2d 601, 607.

We have reviewed the arguments of both parties with respect to the advisability of this instruction in light of the rule set forth by our supreme court in *People v. Prim* (1972), 53 Ill.2d 62, 76, 289 N.E.2d 601, 609-10, directing trial courts when confronted with deadlocked juries to comply with the standards suggested by the American Bar Association Minimum Standards Relating to Jury Trials. However, in this case the foreman did not indicate that the jury was either deadlocked or had reached an impasse in its deliberations. Instead, the foreman advised the court in unequivocal terms that he felt it was possible for the jurors to reach a verdict. Nevertheless, the deadlock instruction was given by the court.

■■ Within the circumstances of this case, we feel that the giving of the deadlock jury instruction was premature. See *United States v. Contreras* (9th cir. 1972), 463 F.2d 773. Although the jury had deliberated

for approximately 10 hours, there was no indication that it was deadlocked. In responding to the trial judge's inquiry, the foreman did not indicate that the jury was having difficulty arriving at a unanimous verdict.

In view of the foregoing, we hold that it was error for the trial court to admit the hearsay statement of the 4-year-old granddaughter of the deceased into evidence, to refuse to exercise discretion in responding to a request by the jury to review trial testimony, and to give a deadlock instruction when the jury was not in fact deadlocked. Therefore, the judgment of the circuit court of Cook County is reversed and remanded for a new trial.

Reversed and remanded.

DIERINGER, P. J., and ADESKO, J., concur.