THIRD DIVISION
March 7, 2007

No. 1-04-3259

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| ERUBY ABREGO, | ) | No. 99 CR 9739 (02) |
| | ) | |
| Defendant-Appellant. | ) | |
| | )) | Honorable |
| | ) | Kenneth J. Wadas, |
| | | Judge Presiding. |

JUSTICE KARNEZIS delivered the opinion of the court:

Following a jury trial, defendant Eruby Abrego was found guilty of first degree murder and aggravated battery with a firearm and was sentenced to consecutive prison terms of 60 and 30 years', respectively. On appeal, defendant contends: (1) the trial court abused its discretion by excluding certain hearsay testimony that an individual other than defendant had confessed to the shooting; (2) the trial court erred by

improperly responding to a note the jury sent to the court during deliberations; (3) the trial court abused its discretion by admitting "gruesome" photographs of the victim; (4) his sentence was excessive; and (5) the compulsory extraction and perpetual storing of his DNA is unconstitutional.

## BACKGROUND

Defendant's conviction was the result of an ongoing conflict between the Insane Orchestra Albany and the Latin Kings street gangs. The jury found defendant guilty of shooting Jose Garcia and Julio Lugo. Garcia died as a result of his injuries. On March 22, 1999, at about 5:30 or 5:45 p.m., defendant was riding in a car with several individuals who belonged to the Insane Orchestra Albany gang. They drove to the area of Belmont Avenue and Monticello Avenue where they saw another car with members of the Latin Kings' gang. They flashed gang signs at the Latin Kings, "threw down" the Latin Kings sign and threw a bottle at their car. The car with the Latin Kings drove around the corner, and Julio Lugo and his 11-year-old cousin, Isidro Quinones, exited the car. Lugo and Quinones were walking toward a grocery store when they stopped to talk to Ramon Torres and Jose Garcia, who were sitting in a nearby car. As they were talking, defendant approached the group on foot and began shooting, hitting Garcia and Lugo. Defendant then fled.

Subsequently, defendant was arrested and identified in a lineup by Torres and Quinones as the shooter. Defendant also signed a court-reported statement admitting he was the shooter, which was introduced into evidence at trial. The gun used in the

2

shooting was recovered from a fellow gang member's home.

ANALYSIS

Defendant first contends that the trial court abused its discretion by excluding certain hearsay testimony that an individual other than defendant had confessed to the shooting.  Prior to trial, defendant filed a motion pursuant to Chambers v. Mississippi, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), to admit statements made by Jason Rodriguez to his girlfriend, Elizabeth Montalvo, that Rodriguez was involved in the shooting.  The court held a hearing on the matter.

At the hearing, Montalvo testified that on March 22, 1999, she had been living with Rodriguez for about six months.  They also have a child together.  On that night, Rodriguez told Montalvo that he had to take care of something or had to prove something and asked her to get his black "hoody."  Rodriguez left and returned about four hours later.  Montalvo stated that when Rodriguez returned, he appeared very nervous and closed the window blinds.  She asked him what was wrong, but he did not answer.  A couple of days later, Rodriguez's friend came to the house and told Rodriguez that he needed to hide.  Montalvo stated that she would not let Rodriguez leave until he told her what was "going on."  Rodriguez told her that the reason he had to hide was because he shot a Latin King.  He said that he was on Belmont Avenue, by himself, when he got out of his car and approached some individuals.  He heard one of them say in Spanish "watch that black guy."  He approached the group, looked one of them in the eye and shot at them.  He said that he shot two people.  Montalvo stated

that she was not sure where on Belmont Avenue the shooting occurred but guessed it was around Belmont Avenue and Central Park. Montalvo stated that after a few days, Rodriguez returned and told her that everything was all right because someone else had been charged with the shooting. Montalvo further stated that after she and Rodriguez broke up, he stalked her and beat her and told her not to tell anyone what he had told her. Montalvo described Rodriguez as about 5 feet 11 inches to 6 feet tall and dark complected with a heavy build. On cross-examination, Montalvo stated that Rodriguez left the house on the night of the shooting at about 6:30 or 7:30 p.m. When Rodriguez returned, he was wearing a T-shirt, blue jeans and white gym shoes.

Nicasio Santiago testified that on March 22, 1999, in the afternoon or early evening, he was riding in a car with Jason Rodriguez in the Logan Square neighborhood. According to Santiago, defendant was not with them. Santiago and Rodriguez exited the car and saw a group of Latin Kings around Belmont Avenue and Monticello Avenue. They exchanged gang signs with the Latin Kings and threw bottles at their car. He and Rodriguez walked around the corner and saw the Latin Kings' car. Rodriguez approached the car and the individuals standing near the car and started shooting at them. He and Rodriguez then fled. Santiago described Rodriguez as about 5 feet 9 inches tall. On cross-examination, Santiago acknowledged that he had signed a statement written by an assistant State's Attorney, but stated that the statement was untrue and the result of police brutality. According to the statement, he did not implicate Rodriguez in the shooting.

Julio Lugo testified that the shooter was dark complected, was shorter than 5 feet 8 inches or 5 feet 9 inches and was wearing a dark-colored jogging suit. He also described the shooter as "caramel complected."

Detective Guevara testified that he and his partner interviewed Lugo after the shooting and Lugo described the shooter as a Hispanic male in his twenties, 5 feet 8 inches to 5 feet 10 inches tall, weighing about 200 pounds, and wearing a dark-colored jogging suit.

Officer Thesedosia Jaks testified that she wrote a police report from an interview with Ramon Torres and Julio Lugo. The report indicated that the shooter had been described as a dark Hispanic male, 5 feet 7 inches tall, weighing 200 pounds, and wearing a brown sweatsuit with a hoody.

Officer Eduardo Rios testified that he obtained a description of the shooter as a Hispanic male with a black jacket and black hoody.

Detective Raymond Schalk testified that he interviewed Isidro Quinones, who described the shooter as a Hispanic male, 18 to 22 years old, 5 feet 9 inches tall, black hair, dark complected, and wearing a black hoody and black jacket.

The parties stipulated that if Detective Robert Smith would testify, he would state that he interviewed Ramon Torres, who described the shooter as a dark Hispanic male, 19 to 20 years old, about 6 feet tall, 180 pounds, with black hair and wearing a black, zipped jacket with a hoody, and dark jeans and white tennis shoes.

The parties further stipulated that a photograph of Jason Rodriguez from the

5

Chicago police department dated September 16, 1999, indicated that Rodriguez was a black Hispanic male, 5 feet 7 inches tall, weighing 150 pounds, with brown eyes, black hair and a dark complexion.

Following the hearing, the court analyzed the four factors the United States Supreme Court set forth in Chambers v. Mississippi, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, to determine whether Montalvo's testimony was admissible. With regard to the first factor, whether the confession was made spontaneously to a close acquaintance shortly after the crime occurred, the trial court found that there was no question that there was a close relationship between Montalvo and Rodriguez. The court stated however, that because Rodriguez's statement was made two days after the crime occurred, it did not seem spontaneous.

With respect to the second factor, whether the confession was corroborated by some other evidence, the court found that there was not sufficient independent corroboration to the statement. The court stated that Santiago's testimony was not credible and noted that Santiago was

"one of the most disreputable individuals that has ever testified in this courtroom. On a credibility assessment scale of one to ten, his falls somewhere around zero."

The court also stated that Rodriguez's statement was vague, and although it seemed to be an admission to a shooting, it did not necessarily refer to this shooting. The court further stated that the description of the shooter as "dark complected" was vague,

6

because it could mean different things to different people.

With respect to the third factor, whether the confession was self-incriminating and against the declarant's interests, the trial court found that Rodriguez's statement was against his penal interests.

With respect to the fourth factor, whether the declarant was available for cross-examination, the trial court found that the factor was not satisfied.

The court noted in concluding that factor one was only marginally met, factor two was not met, factor three was met, and factor four was not met. The court further stated that there was not a sufficient indicia of reliability regarding the statement from Rodriguez to Montalvo that would make it reliable to give a jury an opportunity to assess it and assess Montalvo's credibility.

In Chambers v. Mississippi, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, the United States Supreme Court found that hearsay statements that satisfy the following factors may be admissible at trial. The factors a court must consider are whether (1) the confession was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the confession was corroborated by some other evidence; (3) the confession was self-incriminating and against the declarant's interests; and (4) the declarant was available for cross-examination. Chambers, 410 U.S. at 300-01; 35 L. Ed. 2d at 312, 93 S. Ct. At 1048-49. These factors are "merely guidelines to admissibility rather than hard and fast requirements." People v. Tenney, 205 Ill. 2d 411, 435 (2002). "[T]he presence of all four factors is not a condition of admissibility."

7

Tenney, 205 Ill. 2d at 435. Rather, the question to consider is "whether the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." People v. Bowel, 111 Ill. 2d 58, 67 (1986). "The admission of evidence is within the sound discretion of the trial court, and its ruling will not be reversed" absent an abuse of discretion. Tenney, 205 Ill. 2d at 436.

Here, as the trial court found, we agree that Rodriguez's statement to Montalvo was made to a close acquaintance. We also agree with the trial court that the statement was not exactly spontaneous. Rodriguez's statement was made in response to Montalvo's questions and Montalvo's insistence that he tell her what was "going on" before he went to "hide out." Defendant relies on People v. Tenney, 205 Ill. 2d 411 (2002), in which our supreme court determined that the declarant's statement could be considered spontaneous even though it was in response to his girlfriend's "demand" for an explanation. The court determined that merely because the declarant's girlfriend asked the declarant "what was going on," that "single, simple question did not rob [the declarant's] statement of spontaneity." Tenney, 205 Ill. 2d at 439. The court then distinguished the case from People v. Hampton, 249 Ill. App. 3d 329 (1993), where the hearsay statement was found to be inadmissible because it was made in response to "comments and pointed questioning." Tenney, 205 Ill. 2d at 439. We find that Montalvo's questioning of Rodriguez was more akin to the facts in Hampton than in Tenney. Montalvo stated that she would not let Rodriguez leave until he told her what was "going on." Montalvo's demand that Rodriguez provide her with an explanation

8

was more than just a single, simple question. It was similar to the comments and pointed questioning in Hampton, in which the declarant's response was not considered spontaneous.

Defendant questions the viability of the Hampton decision, alleging that it was overturned by the federal court. The defendant Hampton filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254 (2000) in federal district court, which the court denied. The Seventh Circuit Court of Appeals vacated the denial of Hampton's petition and remanded the matter to the district court for further proceedings to consider Hampton's claim that his trial counsel was ineffective in failing to file a timely motion to reconsider the trial court's judgment. See Hampton v. Roth, 221 F.3d 1338 (7th Cir. 2000). The untimely motion to reconsider had alleged that Mel Thompson's confession to Constance Catchings that he had committed the crime could be corroborated by the testimony of Johnnie Smith, a newly discovered witness, who claimed that Thompson also confessed to him. The trial court had barred Catchings' testimony pursuant to Chambers because there was no corroboration of the confession. The motion to reconsider had been denied solely on the grounds that it was untimely. Upon remand from the Seventh Circuit, the district court found that Hampton had been prejudiced by his trial counsel's failure to file a timely motion for reconsideration. The district court granted Hampton's petition for habeas corpus but stayed execution of the writ on the condition that the State of Illinois grant Hampton a new trial. See U.S. ex rel. Hampton v. Roth, No. 97 C 7994 (September 25, 2000).

9

We disagree with defendant's contention that Hampton is no longer good law. Hampton's petition for writ of habeas corpus and subsequent new trial was granted on the basis that Hampton was prejudiced by his trial counsel's failure to file a timely motion to reconsider in which he alleged that a newly discovered witness could corroborate Mel Thompson's confession to Constance Catchings. This court's opinion and the trial court's finding that Thompson's confession to Catchings was not spontaneous because it was made in response to comments and pointed questioning are still viable. Neither the federal district court nor the Seventh Circuit commented on that aspect of the trial court's finding. Further, our supreme court's decision in Tenney was two years after the federal district court's order granting Hampton's petition. Had Hampton been "overturned," our supreme court would have had no need to distinguish it. Therefore, we find that Hampton is still viable and instructive for purposes of our analysis.

Moving on to the final part of the first Chambers factor, we note that Rodriguez's statement to Montalvo was not made shortly after the crime occurred, but was made two days after the shooting. However, this court has determined that two days can be considered "shortly after the crime occurred." See People v. Anderson, 291 Ill. App. 3d 843, 850 (1997). Therefore, we agree with the trial court that the first factor is only somewhat satisfied.

Considering the second factor, defendant raises the following points of corroboration in addition to Santiago's testimony; Rodriguez shot at two people; the

shooting occurred on Belmont Avenue; the eyewitness descriptions of the shooter were of a dark-complected Hispanic male between 5 feet 7 inches and 6 feet tall, wearing a black hoody; and the victims were Latin Kings.

Here, as the trial court found, these corroborating details are somewhat vague and could easily refer to a different shooting. The description of the shooter as a dark-complected Hispanic male between 5 feet 7 inches and 6 feet tall is somewhat generic. And, hoody sweatshirts are extremely commonplace. Although the corroborating detail that the shooting occurred on Belmont Avenue is more specific, Rodriguez's statement did not specify where on Belmont Avenue he shot at two people. As the trial court noted, Belmont Avenue runs as far east as the lake and as far west as the City of Chicago's limits. Additionally, the victims' identities as Latin Kings is also more specific, but, not specific enough such it could independently corroborate Rodriguez's statements. Rival gang violence is unfortunately a routine occurrence. Further, there is other contradictory evidence; namely, the time frame when Rodriguez left his home on the night of the shooting. Montalvo stated that Rodriguez left home at about 6:30 or 7:30 p.m. that night. Testimony at trial established that the shooting occurred at about 5:30 or 5:45 p.m. Therefore, we agree with the trial court that this factor is not satisfied.

Considering the third factor, we agree that Rodriguez's statements are self-incriminating and against his interests.

Considering the fourth factor, defendant failed to establish that Rodriguez was available for cross-examination. The trial court was not presented with any evidence

11

that Rodriguez was available for cross-examination. Therefore, we agree with the trial court's finding that this factor is not satisfied.

In conclusion, we find that only the third Chambers factor was satisfied. The first factor was only somewhat satisfied and the other two factors were not. Although the factors are merely guidelines to admissibility rather than requirements, the absence of the majority of factors in this case leads us to conclude that Rodriguez's declaration was not made under circumstances that provide "considerable assurance" of its reliability. Therefore, we find that the trial court's determination to exclude Montalvo's testimony was not an abuse of discretion.

Despite the trial court's ruling, defendant additionally contends that Montalvo's testimony from the hearing should have been admissible at trial because she failed to respond to a subpoena and thus was unavailable to testify at trial. Defendant further contends that, in the alternative, the trial court should have admitted the nonhearsay portions of Montalvo's testimony. Defendant's contentions are misplaced. Montalvo's testimony was excluded because it was found to be unreliable. Even if she became unavailable to testify at trial, her prior testimony would still be excluded because it did not satisfy the criteria set forth in Chambers. Moreover, her testimony as a whole was found to be unreliable pursuant to Chambers; therefore, it was not an abuse of discretion for the trial court to exclude the nonhearsay portions of Montalvo's testimony.

Additionally, we note that the evidence in this case was not closely balanced.

Defendant was positively identified in a lineup by eyewitnesses Ramon Torres and Isidro Quinones, defendant signed a court-reported statement admitting he was the shooter, and the gun used in the shooting was found in a fellow gang member's home.

JURY NOTE

Next, defendant contends that the trial court erred by improperly responding to a note the jury sent to the court during deliberations.

During deliberations, the jury sent the trial court four notes. The fourth note, which is at issue in this appeal, stated, "[M]ay we see Daniel Gallagher's bond hearing report taken on March 27th, 1999."

Daniel Gallagher was defendant's public defender in bond court on March 27, 1999. Gallagher testified at trial that he did not have any independent recollection of the matter and referred to the transcript from the bond hearing to refresh his recollection. Gallagher testified that according to the transcript, defendant told Gallagher that he had been beaten by police and had been coughing up blood. Also according to the transcript, Gallagher asked the court to note the cuts on defendant's chest and bruises on his arm; however, there was no indication from the transcript whether the judge noted any injuries. The bond hearing transcript was not admitted into evidence at defendant's trial.

The trial court gave the jurors each of the reports they requested in their first three notes. However, after reading the fourth note, the judge and the parties agreed that a bond hearing "report" did not exist. Defense counsel argued that the trial court

13

should inform the jury that no report existed. Defense counsel also argued that the jurors' note indicated that they wanted the transcript from defendant's bond hearing, and their note erroneously asked for a "report" rather than the "transcript." The court disagreed with defense counsel, stating that if the jurors had wanted the transcript, they would have asked for the transcript rather than a report. The court thought it would be improper to interpret the jury's note by reading into or creating a word that the jury did not use. The court further stated:

> "[T]o tell them there is no bond hearing report is a finding of fact. I am not finding any facts in this case. That's what they asked for. We don't have anything like that. If they want a transcript and ask for a transcript, then we will deal with that issue when they ask for it."

The court responded to the jurors' note by informing them that they had all the evidence and to continue deliberating.

Defendant's contention on appeal is not entirely clear. Defendant argues in his opening brief that the trial court abused its discretion by denying the jury's request for defendant's bond hearing "transcript." However, defendant argues in his reply brief that the jury requested the transcript of Gallagher's trial testimony. Defendant's inconsistent argument may be attributed to the State's argument in its brief that the trial court's response was proper because even if the jury had requested the bond hearing transcript, the transcript was not admitted into evidence at defendant's trial and would not have been available to the jury. Nevertheless, the thrust of defendant's contention

14

on appeal is that the trial court erred in replying to the jury's note because it mistakenly believed that it had no discretion to ascertain what the jury's note meant. Defendant argues that error may result where the trial court fails to ascertain specifically what the jury is requesting because the trial court mistakenly believes it is without discretion to do so. People v. Jackson, 26 Ill. App. 3d 618 (1975); People v. Queen, 56 Ill. 2d 560 (1974); and People v. Autman, 58 Ill. 2d 171 (1974).

The Jackson, Queen and Autman decisions are based on our supreme court's decision in People v. Pierce, 56 Ill. 2d 361 (1974). In Pierce, our supreme court held that it is within the trial court's discretion to allow or refuse a jury's request for a review of testimony. In Jackson, Queen and Autman, the trial courts' responses to the juries' notes were found to be in error because it was clear that they mistakenly believed they were without discretion to consider the juries' request. In Jackson, the jury requested a transcript of the trial, which the trial court denied. This court found on appeal that the trial court failed to ascertain from the jury the specific testimony that it wished to review and failed to fulfill its duty of determining whether a review of the requested testimony would have assisted the jury in its deliberations. Jackson, 26 Ill. App. 3d at 629. In Queen, 56 Ill. 2d at 565, the jury requested "defendant's words on the stand." The trial court replied "'I cannot have any testimony of any witnesses read to you.'" Queen, 56 Ill. 2d at 565. In Autman, the jury requested a transcript of three witnesses' testimony and the trial court simply responded "no."

Here, we disagree with defendant's interpretation of the court's response. We do

15

not believe that the evidence indicated that the court thought it was without discretion to do anything other than to tell the jury to keep deliberating. The court did not state that it had no discretion to inquire into the jury's note. The court simply stated that the report for which the jury asked did not exist, and it was not going to attempt to second-guess the jurors' intentions by reading meanings into words that were not there. Therefore, we agree with the trial court that the proper answer to the jury's note was to inform the jurors that they had all the evidence and they should continue deliberating.

PHOTOGRAPHS

Next, defendant contends that the trial court abused its discretion by admitting "gruesome" photographs of the victim, Jose Garcia, which deprived him of a fair trial because the photographs were prejudicial and not probative of any fact in issue. Specifically, defendant argues that People's Exhibits 45, 46, 47 and 48 should not have been admitted into evidence.

Dr. Nancy Jones, a forensic pathologist, testified at trial that she performed an autopsy on the victim's body and noted that the victim had two gunshot wounds to the head. She described People's Exhibit 45 as "a close up photograph taken of the gunshot wound that was in the center of [the victim's] forehead to show the unusual appearance of that particular wound." She identified People's Exhibit 46 as "a photograph that was taken at the beginning of the internal examination of [the victim's] head [to show] where the bullet that had caused the injury in the right forehead or the forehead region had struck the frontal bond and been deflected outward." She

16

identified People's Exhibit 47 as " a close up photograph taken of [the victim's] left eye, it shows the location and the appearance of the gunshot wound that was there."  She also identified People's Exhibit 48 as "a photograph that was taken during the internal examination of the head, the skull cap has been removed so that the brain has been exposed, and the bleeding and the damage that was caused to the brain from the bullet coursing through the head can be seen in this photograph.  Also, what can be seen is some of the fractures in the frontal region above the eye that's the base of the skull."

On cross-examination, Dr. Jones testified that one of the wounds had evidence of close-range firing, whereas the other wound did not.  On redirect examination, she explained that one of the wounds had "very scant or very few numbers of small abrasions that are present around the wound that appear to be something like stippling," which could indicate close-range firing.  She also explained that a stippling effect could be caused from something like the bullet hitting glass first and then the victim.  Dr. Jones further stated that she was unable to determine whether one of the wounds was from close-range firing.

At the close of evidence the State sought to admit People's Exhibits 45, 46, 47 and 48.  The defense objected, arguing that the photographs were "horrendously graphic and gruesome."  The court admitted the photographs, finding that they were relevant to the issue of close-range firing, which was raised by the defense in the cross-examination of Dr. Jones.  The court explained that "these photos are going in because the jury will get to see the stippling, if it is that, or it is possibly bullet glass from window

residue that might have made the tattooing on the face." The court further found that the photographs would augment Dr. Jones' testimony relating to the cause and manner of death.

If photographic evidence is relevant to prove facts at issue and if the probative value outweighs the potential prejudice, the photographs are admissible, even if such photographs are gruesome. People v. Mercado, 333 Ill. App. 3d 994, 1001 (2002). The trial court's admission of photographs will not be reversed absent an abuse of discretion. People v. Rissley, 165 Ill. 2d 364, 403 (1995).

Here, each of the photographs showed the bullet wounds and the damage they caused to the victim's body. They were relevant to illustrate Dr. Jones' testimony as well as to shed light on the issue of close-range firing. Although we agree with defendant to some extent that the photographs can be characterized as "gruesome," that alone does not preclude their admission. See Mercado, 333 Ill. App. 3d at 1001. We are not persuaded by defendant's contention that the photographs were of such a gruesome nature that any prejudice outweighed their probative value.

SENTENCING

Next, defendant contends that the trial court abused its discretion in sentencing him to the maximum sentence for each offense. Defendant argues that he had no prior convictions, was 20 years old when the crime was committed, and had rehabilitative potential. Defendant asks this court to reduce his sentence to a more appropriate term or to remand the cause to the trial court for a new sentencing hearing.

The State responds that defendant has waived any challenge to his sentence by failing to file a motion to reconsider his sentence. Although waiver limits a party's ability to raise an argument, it does not preclude our jurisdiction to consider it. People v. Benford, 349 Ill. App. 3d 721, 734 (2004). Accordingly, we will address defendant's contention. We are mindful, however, that we afford great deference to the circuit court's sentencing decision. People v. Fern, 189 Ill. 2d 48, 53 (1999). Absent an abuse of discretion, a sentence within the appropriate range will be affirmed. People v. Coleman, 166 Ill. 2d 247, 258 (1995).

At defendant's sentencing hearing, the defense presented the testimony of three witnesses who attested to defendant's good character. Maria Castro, who is the mother of defendant's two children, testified that defendant was a good parent and always provided for his family. Michelle Bolova, a friend of defendant's family, testified that defendant was a good person and was always very respectful, and she noted that defendant helped organize sports games for kids at the park. Defendant's father testified that he has always had a very close relationship with defendant and defendant was very involved with their church and participated in the local YMCA's activities.

Before imposing sentence, the trial court noted defendant's lack of criminal history in mitigation. In aggravation, the court found that defendant's conduct caused or threatened serious harm, the sentence was necessary to deter others from committing the same crime, and defendant committed the offense to further activities of an organized gang. The court also stated

"[T]he seriousness of the factors in aggravation greatly outweigh the defendant's one sole mitigating factor. And I think that the fact that the defendant did not have a prior criminal background somehow and he should not be rewarded by skipping little league baseball, pony league, high school ball and college tryout and the major leagues. He chose to play at the major league level on his first offense, which is murder and aggravated battery with a firearm."

The court then sentenced defendant to the maximum sentence of 60 years for first degree murder and 30 years for aggravated battery, with the sentences to run consecutive to one another.

Here, the sentencing range for the offense of first degree murder was 20 to 60 years. 730 ILCS 5/5-8-1(a)(1)(a) (West Supp. 1999). The sentencing range for the offense of aggravated battery, a Class X felony, was 6 to 30 years. 730 ILCS 5/5-8-1(a)(3) (West Supp. 1999). The trial court's sentence was clearly within the statutory limits. It is also clear the court did consider defendant's lack of criminal history before imposing sentence. Although the court did not specifically comment on defendant's age and potential for rehabilitation, the court stated that it had read the presentence investigation report and had considered the relevant factors before imposing sentence. The court then weighed these factors with the aggravating factors to determine an appropriate sentence. Here, defendant was convicted of shooting at a group of individuals, including one of whom was 11 years old, because of a gang rivalry. We

20

cannot say that, under these circumstances, the trial court's sentence was an abuse of discretion.

## DNA EXTRACTION

Lastly, defendant contends that the compulsory extraction and perpetual storing of his DNA pursuant to section 5-4-3 of the Unified Code of Corrections (730 ILCS 5/5-4-3 (West 2004)) (Code)  violates his constitutional right to be free from unreasonable searches and seizures.

As defendant correctly acknowledges in his reply brief, our supreme court recently found section 5-4-3 of the Code constitutional in People v. Garvin, 219 Ill. 2d 104 (2006).  We are bound by the supreme court's decision and reject defendant's contention.

Accordingly, we affirm the judgment of the trial court.

Affirmed.

GREIMAN, J., and CUNNINGHAM, J., concur.