2020 IL App (2d) 170459-U
No. 2-17-0459
Order filed March 11, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-1679 |
| DEVONNE MONTGOMERY, | ) ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed the conviction of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2014)) where (1) there was no ineffective assistance of counsel for failing to file a motion to suppress, (2) expert testimony was properly admitted, (3) there was sufficient evidence to prove defendant's guilt beyond a reasonable doubt, and (4) the court did not err in giving a supplemental instruction.

¶ 2   Defendant, Devonne Montgomery, appeals his conviction following a jury trial in April 2017 of one count of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2014)). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Paul Becknell testified at the trial that on October 18, 2015, at approximately 1:50 a.m., he and Koby Dauel were patrolling the parking lots at the Buena Vista Apartment complex in Elgin. Becknell was employed as a tow truck driver for Judicial Recovery Systems, which had a contract to "relocate" unauthorized vehicles from Buena Vista's property, and Dauel was working as his assistant.

¶ 5        Becknell identified an older model Lincoln without a resident sticker or visitor pass that was parked on the property. He backed his tow truck up to the rear of the Lincoln, and extended his "boom" under the car to ready it for towing. Becknell testified that all of the lights of the tow truck were turned on at this time, which included the flashing red and yellow lights, headlights, taillights, and spotlights that pointed to the rear of the tow truck from the top of the cab. Becknell then used the boom to lift the rear end of the Lincoln off the ground, and began to slowly drive the tow truck forward. Just then a man knocked on the driver's side window. Becknell described him as a tall, thin, black male with dreadlocks. Becknell testified that he had seen this man standing on a second-floor balcony of an adjacent building while he secured the Lincoln. Becknell came to a stop and rolled down his window. The man claimed that the Lincoln was his car. Becknell testified that the conversation with the man remained calm and non-confrontational. Becknell exited the tow truck, explaining to the man that without a visitor pass, he was risking having his car towed. Becknell lowered the Lincoln back to the ground, intending to release the car to the man with dreadlocks.

¶ 6        After Becknell unhooked the Lincoln, a "short, petite, black" female approached their position. Becknell testified that the female came from around the corner of the same building where he had observed the man with dreadlocks standing on a balcony. Becknell testified that the

man with dreadlocks walked toward the female, who was then standing near the front end of the Lincoln. Seconds after the female appeared, a second black male came running from around the corner of the same building from which the female had appeared. Becknell described this second black male as shorter and stockier than the man with dreadlocks. He testified that the second male was in his early 20s, had short hair, and was wearing a black t-shirt. Becknell also testified that he was "pretty sure" that the second man was wearing jeans. Becknell said that the man was upset and yelling, and that he positioned himself on the passenger side of the tow truck between the two vehicles, directly opposite Becknell's position on the driver's side of the tow truck. Becknell testified that he told the man "to mind his own business" and that he had already resolved the situation with the car's owner.

¶ 7    The second man continued to yell and curse at Becknell. Still standing in the same position between the tow truck and the Lincoln on the passenger side of the tow truck, the second man reached into his waistband and pulled out a black handgun. The man fired the gun, hitting Becknell in the left clavicle. Uncertain at this point whether he had been shot, Becknell ran toward the driver's door of the tow truck, struggling to get inside as he had lost control of his left arm. He heard a second gunshot immediately behind his head as he attempted to climb into the truck; he likewise was unsure whether the second shot had hit him. Becknell testified that he "jumped in and started to drive away." In the confusion of the moment, he believed that he inadvertently turned the truck lights off. He turned the light switch, "like you would get in a vehicle and turn the lights on," except that Becknell's action instead turned the truck's lights off. A Buena Vista security officer testified that he saw the tow truck "racing out of the area with no lights on," with sparks flying because the boom was dragging behind on the ground. Becknell said that he drove

a short distance before pulling over because he was "having a hard time" and could feel "liquid going into my lung." He moved into the passenger seat and Dauel drove them to the hospital.

¶ 8    During the State's direct examination, Becknell made an in-court identification of defendant as the person who shot him.

¶ 9    Dauel testified that he was at the Buena Vista Apartments with Becknell during the early morning hours of October 18, 2015. The two of them were looking for unauthorized cars on the property when Becknell spotted an older model Lincoln with no parking pass. Dauel testified that he was in the passenger seat of the tow truck when Becknell hooked up the Lincoln to the tow truck. Dauel stated that all of the vehicle lights were turned on at this time and remained on until after Becknell had been shot, including the flashing red and yellow lights, headlights, taillights, and spotlights that pointed to the rear of the tow truck from the top of the cab. Dauel additionally testified that the apartment complex "has streetlights all over it," and that the lights from the tow truck combined with the streetlights illuminated the entire area from the tow truck to the nearby buildings. Once Becknell had raised the Lincoln off the ground and began to drive away, Dauel saw a thin black man in his early 20s with shoulder-length dreadlocks knock on the driver's side window. The man said that it was his car. Dauel said that Becknell then exited the cab of the tow truck and lowered the Lincoln to the ground. Dauel described the interaction between Becknell and the man with dreadlocks as a "calm, normal conversation." Dauel continued to observe Becknell and the man through the rear window of the tow truck, but he could no longer make out their words once Becknell was outside the vehicle. Dauel testified that he saw two people approach from behind the tow truck from the rear of the adjacent apartment building. The first was a short black female in her early 20s, who handed keys to the man with dreadlocks. The second person was a black male with short hair who was shorter in height than the man with dreadlocks. Dauel

testified that the second man positioned himself between the Lincoln and the tow truck on the passenger side of the tow truck, directly opposite of Becknell, who was also between the two vehicles, but on the driver side of the tow truck. Though Dauel could not hear the actual words being used, he described the tone of the second man's voice as confrontational, loud, and angry. Dauel testified that he had an unobstructed and illuminated view of the second man. Dauel said that he saw the second man raise a black semiautomatic pistol and shoot Becknell. Dauel testified that Becknell then quickly attempted to get back inside the tow truck, but that he was having difficulty climbing inside. As Dauel reached over to help Becknell into the tow truck, he saw the shooter run up on the driver's side of the tow truck, raise the gun, and shoot again. Dauel ducked as he continued to help Becknell. Becknell made it into the tow truck, and they sped away with the boom still dragging behind on the ground. Dauel testified that Becknell drove 500 yards and then came to a stop. The two men switched positions and Dauel drove them to the hospital.

¶ 10     Dauel called 9-1-1 in route to Saint Joseph Hospital in Elgin. The 9-1-1 recording was played for the jury. Dauel was initially frantic and his words were unintelligible, but he soon calmed down and his speech became clear. Dauel told the 9-1-1 dispatcher that he and Becknell were tow truck drivers for Judicial Recovery and that Becknell had been shot twice, once in the arm and once in an unknown location. Dauel said that the shooting occurred at the Buena Vista Apartments and described the shooter as a black man, about 5'6" to 5'8", wearing a black sweatshirt. The 9-1-1 operator asked if the shooter was heavyset or thin build, and Dauel answered that he had a thin build.

¶ 11     During his trial testimony, Dauel made an in-court identification of defendant as the man who shot Becknell.

¶ 12    Becknell and Dauel were met at the hospital by Officer Brad Duffy of the Elgin Police Department.  Becknell told Duffy the precise location where the shooting took place and described the shooter as a black male, approximately six feet tall, 180 pounds, wearing a black shirt and possibly blue jeans.  Duffy transmitted this information to officers already on the scene at the Buena Vista Apartments.

¶ 13    Dauel spoke to Officer Kevin Snow of the Elgin Police Department at the hospital.  Dauel told Snow that the shooter was a black male in his twenties, 5'6" to 5'7" who weighed about 150 pounds.  Dauel indicated that he could identify the shooter if he saw him again.

¶ 14    Snow then drove Dauel back to the Buena Vista Apartments.  After they arrived at the apartments, Dauel pointed to the location of the shooting.  The Lincoln was no longer there.  Dauel told Snow that he had observed people on a second-floor balcony as he and Becknell were pulling the Lincoln out of its parking spot.  The balcony was in the same building where the young woman and the shooter came out from behind when they approached the tow truck.  Snow relayed this information regarding the shooter's description and potential location to other officers on the scene, who determined which apartment was connected to the second-floor balcony.  A few minutes later, Officer Richard Free observed a black male, whom Free said matched the description of the shooter transmitted by Snow, and a female companion, Jasmine June, attempt to enter the apartment that connected to the second-floor balcony.  Free and another officer approached the couple and advised them that there was a situation outside the building and that they needed to ID everybody.  After determining their names, Free set up a "show-up" identification with Snow, where Dauel would view these subjects and relate whether they were the ones involved in the shooting.  Free walked defendant to a grassy area outside the building about 45 feet from Snow's squad car.

¶ 15    After Free arrived with defendant at the grassy area, Snow illuminated defendant with his squad car's spotlight.  Snow told Dauel that officers had located a subject that may or may not have been involved.  Dauel studied the subject for "a minute or two" and Snow testified that he said: "Yeah, that's the subject that shot [Becknell]."  Snow paused for a moment and then asked Dauel if he was 100% certain that this was the same man.  Snow testified that Dauel answered: "I remember the black shirt that the shooter was wearing.  Yeah, that's the subject that shot [Becknell]."  Snow relayed the positive identification to Free, and defendant was handcuffed and placed in custody.

¶ 16    June was then brought out and illuminated with the spotlight.  Dauel told Snow that she was not the same female he had seen earlier with defendant and the man with dreadlocks.  June was released.

¶ 17    Officer Paul Dublinski testified that he transported defendant from the Buena Vista Apartments to the police station.  Once at the police station, Dublinski placed defendant into a specific holding cell that was not equipped with running water or toilets, which is meant to help preserve any evidence that might be on the arrestee's person.  Dublinski said that he had defendant disrobe and place his clothing on the floor of the holding cell.  Dublinski then collected defendant's shoes, pants, shirt, and belt, and placed them in a bag before giving them to Officer James Bailey.

¶ 18    Bailey testified that he is a supervisor for the Evidence Response Team, which is a group of evidence technicians that respond to crime scenes to collect and preserve evidence.  Bailey responded to the reported shooting on October 18, 2015.  He and his colleagues located two spent 9mm shell casings near the scene of the shooting.

¶ 19    After leaving the crime scene, Bailey returned to the police station, where he used a gunshot residue kit to collect potential gunshot residue from defendant's hands.  Bailey testified that he

had specific and extensive training in the collection of gunshot residue evidence. Bailey also received the bag from Dublinski that contained the clothing collected from defendant. Bailey testified that, because of the risk of cross-contamination, it was improper for Dublinski to allow the clothing to make contact with the floor of the holding cell and to place all of the clothing in a single bag. Bailey said that other arrestees who had similar gunshot residue tests were held in the same area in the past, which created a risk of contamination. However, Bailey also testified that no weapons are permitted in that holding area and that a janitorial staff cleans the cells. Using procedures consistent with his training and experience, Bailey removed each item of clothing from the bag Dublinski had given him and placed each item in its own evidence bag, which were then sent to the Illinois State Police for testing.

¶ 20    Later that morning, Bailey returned to the crime scene. He and his colleagues located a 9mm Beretta handgun in a grassy area inside a tree line at the Buena Vista Apartments.

¶ 21    Ellen Chapman, a forensic scientist with the Illinois State Police, testified that she examined the clothing and the gunshot residue kit collected from defendant. Chapman was questioned about her qualifications. She testified that she had a bachelor of science in chemistry, master's classes in forensic science, vocational training, nearly 30 years of experience as a forensic scientist, and that she had testified more than one hundred times as an expert witness in the areas of the analysis and identification of primer gunshot residue. Without objection, the court found her to be an expert. Chapman testified generally to her methods and procedures, and specifically how she tested each item that related to this case. She also testified to a variety of controls used to ensure that the electron scanning microscope that is used to scan materials for gunshot residue was in proper working order. Chapman explained the science of how gunshot residue is created and collected, and testified that a positive test for gunshot residue indicates that the surface of the

tested object "either contacted gunshot residue-related items or was in the environment of a discharged firearm." Her testing of defendant's blue jeans revealed three particles of gunshot residue and "additional consistent gunshot residue particles." Chapman further testified that she found one gunshot residue particle on the sample from defendant's right hand, and one gunshot residue particle on the lower front portion of defendant's t-shirt. One particle, however, is below the Illinois State Police threshold to make a positive conclusion for gunshot residue.

¶ 22    Christina Davison testified as an expert in the area of firearms and firearms identification. She testified that she worked for the Illinois State Police at the crime laboratory in Rockford. She testified that she examined the shell casings collected at the scene and determined to a reasonable degree of scientific certainty that they were fired from the same gun that was recovered in the tree line at the Buena Vista Apartments on the morning of the shooting. Davison also compared the bullet fragment removed from Becknell's shoulder to a bullet test-fired from the gun recovered at the scene, and she determined to a reasonable degree of scientific certainty that the bullet fragment was fired from that gun.

¶ 23    During closing argument, defendant emphasized that Becknell was alert when he viewed the photo array in the hospital, and that he was unable to identify defendant at that time. Defendant additionally noted that Becknell told a detective that it was "real dark" that night and that he could not get a good look at the shooter's face. Defendant argued that Becknell's in-court identification was premised on a newspaper article that Becknell admitted to seeing. As to Dauel, defendant argued that he was the "star witness." According to defendant, Dauel was unable to identify any of the details of defendant's shirt even though he based his show-up identification on the shirt. Defendant highlighted several inconsistencies in Dauel's description of defendant to police, including the shirt and defendant's build.

¶ 24    After nearly eight hours of deliberations, the court convened the parties.  The court noted that it had not received any communications from the jury indicating that it was deadlocked, but that the court thought eight hours was a significant amount of time to deliberate on this case, given the number of witnesses and the complexity of the evidence.  The court made it clear that it thought that there might be some difficulty in the jury reaching a verdict.  The court informed the parties that it was going to call the jury in and ask the foreperson if he or she believed that the jury could reach a verdict.  The court added: "Whatever their answer is, I'm going to read them 26.07 of the Illinois Pattern Jury Instructions. [the Prim instruction]" Neither the State nor defendant objected to this planned procedure.

¶ 25    The court called the jury into the courtroom.  After the jury foreperson indicated that she believed they could reach a verdict, the court read the jury the supplemental instruction, which is recounted in full in the analysis section of this disposition.  The jury resumed its deliberations.  Less than one hour later, it returned a verdict of guilty on the one count in the indictment.  Defendant timely appealed.

 ¶ 26                              II. ANALYSIS

¶ 27    Defendant argues: (1) ineffective assistance of trial counsel for failing to file a motion to suppress the identifications of defendant by Becknell and Dauel, (2) error for admitting expert testimony regarding gunshot residue, where there was evidence of potential contamination (3) that there was insufficient evidence to prove him guilty beyond a reasonable doubt, and (4) that giving the court's *sua sponte Prim* instruction was plain error, where there was no indication that the jury had reached an impasse. The State responds that (1) there was no ineffective assistance, because a motion to suppress would not have been successful, (2) the gunshot residue testimony was properly admitted and the jury was left to determine its weight, (3) the identifications and forensic

evidence were sufficient to prove defendant's guilt, and (4) there was no error, and thus, no plain error in giving the jury the *Prim* instruction.

¶ 28                    A. Ineffective Assistance of Counsel Claim

¶ 29    Defendant argues that the police did not follow statutory guidelines for the "show-up procedure" used with Dauel and that Becknell was only able to identify defendant after seeing his picture in a newspaper.  Thus, he claims that those identifications were improperly suggestive. Defendant then asserts that the in-court identifications by Becknell and Dauel were tainted by the previous improperly suggestive identifications.  Defendant thus maintains that his trial attorney should have filed a motion to suppress all of the identifications.  The State counters that the trial attorney's decision to impeach the identifications through cross-examination did not fall below an objective standard of reasonableness.  Moreover, a motion to suppress was not likely to succeed, and thus, defendant cannot demonstrate prejudice.  Accordingly, even if counsel's representation fell below an objective level of reasonableness, defendant's ineffective assistance claim still fails.

¶ 30    The sixth amendment of the United States Constitution guarantees all criminal defendants the right to be assisted by an attorney.  *Strickland v. Washington*, 466 U.S. 668, 685 (1984).  The proper standard for competence of attorney performance is that of reasonably effective assistance. *Strickland*, 466 U.S. at 687.

¶ 31    A defendant's claim of ineffective assistance of counsel has two components: (1) counsel's representation fell below an objective standard of reasonableness, and (2) the defendant was prejudiced to the extent that there is a reasonable probability that the outcome at trial would be different but for the defective representation.  *Strickland*, 466 U.S. at 687-94.  A defendant must demonstrate both components to prevail on a claim of ineffective assistance of counsel.  *Strickland*, 466 U.S. at 687.  Thus, we may dispose of an ineffective-assistance claim on the ground that the

defendant suffered no prejudice without addressing whether counsel's performance was objectively unreasonable. *People v. Holmes*, 141 Ill. 2d 204, 233-34 (1990). In determining whether counsel's assistance was ineffective, we employ a bifurcated standard of review, deferring to the trial court's findings of fact unless they are against the manifest weight of the evidence, and considering *de novo* the ultimate legal issue of ineffective assistance. *People v. Cunningham*, 2012 IL App (3d) 100013, ¶ 31. Because the facts surrounding defendant's claim on this issue are undisputed, our review is *de novo*.

¶ 32    In order to establish prejudice for failing to file a motion to suppress, a defendant must show that there is a reasonable probability that (1) the motion would have been granted had it been filed, and (2) the outcome at trial would have been different had the evidence been suppressed. *People v. Bew*, 228 Ill. 2d 122, 128-29 (2008).

¶ 33    To demonstrate the likely success of a motion to suppress a pretrial identification, the defendant has the burden of showing that the identification procedure was impermissibly suggestive. *People v. Brooks*, 187 Ill. 2d 91, 126 (1999). If the defendant satisfies this initial burden, the State may overcome this showing with clear and convincing evidence that the witness identified the defendant based upon his or her independent recollection of the incident. *Brooks*, 187 Ill. 2d at 126. We consider the following factors when determining whether a witness has an independent basis for an identification: (1) the opportunity to view the defendant at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of any prior descriptions by the witness, (4) the level of certainty demonstrated by the witness at the alleged suggestive confrontation, and (5) the length of time between the offense and the alleged suggestive confrontation. *Brooks*, 187 Ill. 2d at 129-30.

¶ 34                1. *Dauel Show-Up and In-Court Identifications*

¶ 35    Defendant argues that the police used a show-up procedure that was inherently suggestive that prompted Dauel to misidentify defendant as the shooter. Defendant further implies, without explicitly stating so, that the improper show-up procedure tainted Dauel's in-court identification of defendant. He argues that both the show-up and in-court identifications should have been suppressed, and that his trial attorney was ineffective for failing to file a motion to suppress the identifications.

¶ 36    The contested show-up identification occurred approximately 37 minutes after the shooting at the same location where Dauel first observed the shooter. Dauel sat in the back of a police squad car, while defendant stood approximately 45 feet away, illuminated by the squad car's spotlight. Dauel studied defendant for a period of time before declaring that he was the shooter. Dauel responded in the affirmative when the officer asked him if he was 100% certain that this was the shooter.

¶ 37    Defendant argues generally that show-up identifications, where a single subject is presented to a witness, are dangerously and grossly suggestive. Defendant cites several cases that use language expressing a negative view of show-up identifications, but he does not explain why this show-up was improper or impermissibly suggestive. He notes that police must not use show-up procedures unless there are compelling reasons not to use a more reliable form of lineup (*People v. Lee*, 44 Ill. 2d 161, 169 (1969)), though he offers no alternative form of identification procedure that the police should have used under these particular circumstances. Defendant argues only that there were inconsistencies surrounding Dauel's identification, such as him telling the 9-1-1 dispatcher that the shooter was wearing a black sweatshirt when defendant was actually wearing a black t-shirt. Any such inconsistencies are irrelevant to the question of whether the show-up procedure itself was impermissibly suggestive. Without explaining why these particular facts

demonstrate impermissible suggestiveness, defendant is essentially arguing that show-up procedures are *per se* impermissibly suggestive. If true, this would satisfy defendant's burden of demonstrating that his motion to suppress was likely to succeed. He additionally asserts that it is "undeniable that the outcome of the trial would have been different" without the identifications. Thus, he concludes that he has satisfied his initial burden to demonstrate that the unfiled motion had a likelihood of success and that it would have affected the outcome of his trial. Therefore, argues defendant, it is now the State's burden to show by clear and convincing evidence that the identifications were made based on Dauel's independent recollections.

¶ 38    Defendant's argument is without merit. While it is true that show-up procedures are often looked upon with disfavor, they have long been upheld as proper under justifiable circumstances. See, *e.g.*, *Stovall v. Denno*, 388 U.S. 293, 302 (1967) (viewing was imperative where it was uncertain that the wounded victim would survive) (abrogated in part on different grounds); *People v. Speck*, 41 Ill. 2d 177, 193 (1969) (nothing fundamentally unfair where the witness had an opportunity to observe the killer for several hours) (vacated in part on sentencing grounds only); *People v. Robinson*, 42 Ill. 2d 371, 375-76 (1969) (no improper pretrial identification where the person who was identified was known to the witness prior to the crime).

¶ 39    In particular, prompt show-ups near the scene of the crime have been held to be acceptable police procedure designed to aid the police in determining whether to end the search or to continue while in fresh pursuit of a suspect. See, *e.g.*, *People v. McKinley*, 69 Ill. 2d 145, 152 (1977) (show-up constitutional when it took place within 30 minutes of the offense and within four blocks of its location); *People v. Libbert*, 89 Ill. 2d 171, 188-89 (1982) (identification properly admitted where no more than 55 minutes elapsed between the robbery and the show-up and it was at a location only two to three miles from the robbery); *People v. Hicks*, 134 Ill. App. 3d 1031, 1036 (1985)

("[T]he Supreme Court has consistently upheld prompt identification of a suspect by a witness or victim near the scene of the crime where they foster the desirable objectives of a fresh, accurate, identification, which may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing offender while the trail is still fresh."); *People v. Rodriguez*, 387 Ill. App. 3d 812, 830 (2008) (show-ups may be justified when there is a need to determine "(1) whether a suspect is innocent and should be released immediately; and (2) whether the police should continue searching for a fleeing culprit while the trail is still fresh.").

¶ 40　　In this case, the show-up took place at the same location and less than an hour after the shooting.　The police encountered defendant attempting to enter the same apartment where Becknell had seen the man with dreadlocks on the balcony, and he fit the then-available general description of the shooter.　The police clearly had an immediate need to determine whether defendant was the shooter or whether they should continue the search.　As noted, defendant does not attempt to explain why this particular show-up was impermissible, nor does he argue that any other form of identification procedure should have been used under these circumstances. Defendant has failed to demonstrate that the show-up procedure was impermissibly suggestive, and thus, has not met his burden to show that a motion to suppress had a reasonable likelihood of success.　Because defendant has not demonstrated that the show-up identification was impermissibly suggestive, it follows that the show-up identification could not have given rise to a substantial likelihood of irreparable misidentification in the subsequent in-court identification. Accordingly, defense counsel was not ineffective for failing to file a motion to suppress Dauel's show-up or in-court identifications.

¶ 41　　　　　　　　　　　　2. *Becknell Identifications*

¶ 42    Defendant argues that Becknell's in-court identification was tainted and unreliable, and that defense counsel was ineffective for failing to file a motion to suppress the in-court identification.  Defendant reasons that if Becknell could not identify him in the photo lineup that took place in the immediate hours following the shooting, then it is unreasonable to think that he could positively identify defendant in court a year and a half later.  According to defendant, Becknell's basis for identifying him in court was a newspaper photograph that Becknell saw in the days following the shooting.  Defendant argues that Becknell's in-court identification of defendant was merely a "regurgitation of a newspaper article, not any sort of independent recollection of the offender."

¶ 43    As noted above, in order to show prejudice under the second prong of *Strickland* for ineffective assistance of counsel for failing to file a motion to suppress, defendant must demonstrate that the motion had a reasonable likelihood of success and that there was a reasonable likelihood that the suppression would have changed the outcome of the trial.  *Bew*, 228 Ill. 2d at 128-29 (2008).  To show a reasonable likelihood of success, defendant must demonstrate that Becknell's viewing of the newspaper photo was orchestrated by law enforcement and that it was so impermissibly suggestive that it created a substantial risk of irreparable misidentification.  See *United States v. Zeiler*, 470 F.2d 717, 720 (3d Cir. 1972) (when there is no evidence that law enforcement officials encouraged or assisted in impermissive identification procedures, such as a newspaper photograph labeling the defendant as a suspect, the proper means of testing a witness' testimony is through cross-examination, and subsequent identifications can be weighed in light of the witness' statements as to his or her reactions to the media coverage); *O'Connell v. State*, 742 N.E.2d 943, 948 (Ind. 2001) ("A witness' viewing of a suspect's photograph through the media does not ordinarily constitute an impermissibly suggestive identification procedure because it is

not engineered by prosecution or law enforcement agencies."); *People v. Follins*, 196 Ill. App. 3d 680, 687-88 (1990) (in-court identification will be suppressed where an out-of-court identification was so unnecessarily suggestive that it gave rise to a substantial likelihood of irreparable misidentification). Thus, the question presented is whether Becknell's in-court identification of defendant was based on an out-of-court photographic identification that was orchestrated by law enforcement or the prosecutor, and that it was so impermissibly suggestive as to create a substantial risk of irreparable misidentification.

¶ 44    We begin with defendant's assertion that Becknell failed to identify him in the photo lineup in the hours following the shooting. The police showed Becknell a photo lineup at the hospital during the afternoon on the day of the shooting. Detective Andrew Houghton showed Becknell an array of six photographs of potential suspects, one of whom was defendant. Becknell did not positively identify any of the persons in the photographs, though he made a statement that it was possible that it may have been either of two persons depicted in the array (defendant was not one of those persons). Becknell testified that when he viewed the photo array, he was still in pain from his fresh gunshot wound, and that he was currently being administered Dilaudid, OxyContin, and Percocet to control his pain. Becknell described his mental condition at the time as: "Everything was kind of blurry, and just out of it [*sic*]." Defendant addresses Becknell's "blurry" state of mind by paraphrasing Houghton's testimony, arguing that the detective "had no concerns that Becknell was impaired at the time of the lineup or that Becknell otherwise misunderstood what was occurring." Houghton did testify that he thought Becknell appeared to understand him, but he also testified that he did not know if Becknell was under the influence of any medications, and he made no inquiries along those lines. Under these circumstances, with a gunshot victim in the hospital only a short time after a shooting, with the bullet still lodged in his shoulder, and where the victim

testified that everything was kind of blurry while he was under the influence of three separate opioids to manage his pain, we cannot say as a matter of law that Becknell's failure to identify defendant at that moment invalidated his subsequent in-court identification.

¶ 45    The next part of defendant's argument asserts that Becknell only identified defendant based upon a photograph in a newspaper article.  Defendant makes no assertion that law enforcement or the prosecutor orchestrated the newspaper viewing, but he still insists that the viewing is the only basis for Becknell's in-court identification.  Defendant asserts that the article "presumably" identified him as the shooter, though the article is not in evidence and there is nothing in the record to support that presumption.  During cross-examination by defendant's attorney, Becknell was asked about a conversation he had with the prosecutor about a week before the trial began:

"Q. Okay.  And you had a conversation with him about your ability to identify the person who had shot you, right?

A. Yes.

Q. And your response to him asking you about your ability to identify the person that shot you was that you saw [defendant's] picture in a newspaper article?

A. Yes.

Q. Isn't that right?

A. Yes.

Q. So is your identification based on your viewing of that photograph in the newspaper article that day, or is it based on your ability to identify him today from memory?

A. No, I identified him that day when I saw him in the paper."

¶ 46    Defendant's interpretation of Becknell's answers in this colloquy is that Becknell admitted that he was only able to recognize defendant based on his viewing of the newspaper article. An alternative reasonable interpretation of Becknell's answers is that he was conveying that he recognized defendant in the newspaper because he already knew what the shooter looked like, not that the newspaper informed him of what the shooter looked like.

¶ 47    The record indicates that Becknell had a sufficient opportunity to observe the shooter during the encounter that ended with Becknell being shot. The shooter ran onto the scene cursing and yelling at Becknell, which caused Becknell to focus his attention on the shooter. The two men exchanged words while separated only by the width of a car, with lighting from the tow truck and streetlights illuminating the area. Becknell's description of his assailant less than 20 minutes after the shooting—a black male with short hair, approximately six feet tall, 180 pounds, and wearing a black t-shirt and possibly blue jeans—was sufficient to enable officers to identify defendant as the possible shooter. Defendant argues that Becknell told Detective Murphy that it was hard to see the shooter's face because it was dark. Becknell testified that he could not remember his exact words in his statement to Murphy, but that it was not so dark that he could not see the shooter's face. Defendant also argues that Becknell did not describe any of the red lettering on the black t-shirt worn by defendant, suggesting that he did not get a good look at it. Any discrepancies or omissions of detail by Becknell, however, would not destroy the validity of his identification, but would go instead to the weight of his testimony, which was for the jury to evaluate. *People v. Bibbs*, 101 Ill. App. 3d 892, 897 (1981) ("[I]t is clear that discrepancies or omissions of detail by an identifying witness do not destroy the validity of the identification but go instead to the weight of the testimony and are to be evaluated by the trier of fact.").

¶ 48    Considering that Becknell had ample opportunity to observe his shooter and was able to describe him in sufficient detail minutes after the shooting, and further considering that defendant does not allege that law enforcement or the prosecutor played any part in Becknell's viewing of the newspaper, defendant has not demonstrated that the viewing of the newspaper photograph was so impermissibly suggestive that it created a substantial risk of irreparable misidentification. *Follins*, 196 Ill. App. 3d at 687-88.    Thus, defendant has not shown prejudice for ineffective assistance of counsel under the second prong of *Strickland* because he has not demonstrated that a motion to suppress would have had a reasonable likelihood of success (*Bew*, 228 Ill. 2d at 128-29 (2008)).

¶ 49    Accordingly, defense counsel was not ineffective for failing to file a motion to suppress Becknell's in-court identification of defendant.    As discussed above, counsel likewise was not ineffective for failing to file a motion to suppress Dauel's show-up and in-court identifications.

¶ 50                                B. Expert Testimony

¶ 51    Defendant argues that the trial court erred by allowing Chapman to testify to her analyses of the primer gunshot residue.    According to defendant, Chapman's testimony was unreliable because the State did not establish a proper foundation for the gunshot residue evidence, given that the chain of custody for the evidence was broken.    Defendant's contention is that the police used improper handling procedures to collect his clothing, creating a risk of cross-contamination, which severed the first link in the chain of custody for the gunshot residue evidence.    Defendant further argues that Chapman's testimony had "no actual probative value" and should have been excluded on relevancy grounds where she "had no way of knowing whether the particles were from contamination or from actual exposure to gunfire."

¶ 52 Defendant argues that the entirety of Chapman's testimony should have been excluded, but his foundational argument on the gunshot residue testimony is necessarily limited to the blue jeans that defendant was wearing. Chapman testified as to her analyses and findings on five separate items: (1) the gunshot residue kit, which contained the samples taken from defendant's hands, (2) defendant's shoes, (3) defendant's belt, (4) defendant's t-shirt, and (5) defendant's blue jeans. Defendant objected at trial only to the admission of the blue jeans, explicitly stating that he had no objection to the admission of any of the other items. Accordingly, defendant forfeited any argument he may have had on appeal regarding the foundation of Chapman's testimony as it related to those items. *People v. Hudson*, 228 Ill. 2d 181, 190 (2008) ("The failure to object to allegedly improper evidence when it is introduced at trial results in forfeiture of the issue for purposes of appeal.").

¶ 53 The State responds that a foundation was laid for the blue jeans, arguing that the blue jeans, not the gunshot residue, was the evidence requiring a foundation. The State argues that any issue of potential contamination went to the weight of the evidence, not its admissibility, and that the weight was for the jury to decide. The State does not address defendant's relevancy argument.

¶ 54 Expert testimony is admissible if the proffered witness is qualified as an expert, a foundation is laid as to the bases for the expert's opinions, and the testimony would assist the trier of fact in understanding the evidence. *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 115; *Soto v. Gaytan*, 313 Ill. App. 3d 137, 146 (2000); Illinois Rule of Evidence 702 (eff. Jan. 1, 2011). A witness may be qualified as an expert when he or she has specialized knowledge, skill, experience, training, or education. *Simmons,* 2016 IL App (1st) 131300, ¶ 115. The proponent of the testimony must lay an adequate foundation for the testimony by showing that the facts or data relied upon by the expert are of a type reasonably relied on by experts in that particular field.

*Simmons,* 2016 IL App (1st) 131300, ¶ 115. Once a proper foundation has been laid to establish the admissibility of an expert's testimony, it is the function of the jury to determine the weight to be assigned to such testimony. *Simmons,* 2016 IL App (1st) 131300, ¶ 115. We review a foundational challenge to the admission of expert testimony for an abuse of discretion, which will only be found "where the trial court's ruling is so arbitrary or fanciful that no reasonable person would take the view adopted by the trial court." (Internal quotations marks omitted.) *Simmons,* 2016 IL App (1st) 131300, ¶ 114.

¶ 55    Defendant argues that we should review his foundational objection to the admission of expert testimony under a *de novo* standard of review, citing *People v. Safford*, 392 Ill. App. 3d 212, 221 (2009), which held that the determination of foundational requirements for expert testimony is a question of law that is reviewed *de novo*. We note that *Safford* was decided in the First District of the Appellate Court, and that a different division of the First District declined to follow *Safford*. *Simmons*, 2016 IL App (1st) 131300, ¶¶ 108-14 ("[W]e respectfully disagree with *Safford*, as well as the body of appellate case law that has developed under *Safford*, on the question of the appropriate standard of review of the sufficiency of the foundation for an expert's opinion."). The *Simmons* court acknowledged that our supreme court has only ever applied an abuse-of-discretion standard to questions regarding the sufficiency of the foundation for an expert's testimony, and notably, continued to apply that same standard of review in the wake of *Safford*. See, *e.g.*, *People v. Williams*, 238 Ill. 2d 125, 136 (2010) ("We apply the abuse of discretion standard to the defendant's foundational challenge to the trial court's admission of Lambatos' expert testimony."). Thus, we follow our supreme court and review defendant's foundational challenge to the admission of expert testimony for an abuse of discretion. *Simmons*, 2016 IL App (1st) 131300, ¶ 114.

¶ 56                    1. *Foundation for Expert's Testimony*

¶ 57    After defendant's arrest, he was ordered to disrobe in a holding cell and to put his clothing on the floor. Dublinski picked up defendant's shirt, blue jeans, belt, and shoes off of the floor and placed them in a single evidence bag. Bailey testified that the clothes should have been placed in separate evidence bags and should not have been placed on the floor. Upon receiving the evidence bag from Dublinski, Bailey took the items out of the bag in a sterile environment and placed them into individual bags, which were then sent to the Illinois State Police for testing.

¶ 58    Defendant argues that the first link in the chain of custody was severed when Dublinski allowed the clothing to be put on the floor, reasoning that gunshot residue is microscopic and cannot be seen by the human eye, and therefore, requires a proper chain of custody to demonstrate foundation. *People v. Winters*, 97 Ill. App. 3d 288, 289-90 (1981) (chain of custody required when offered evidence is not readily identifiable or is susceptible to alteration). Defendant concludes that it was the State's burden to "remove the probability of exchange, contamination, or tampering" with regard to the gunshot residue evidence, citing *People v. Terry*, 211 Ill. App. 3d 968, 973 (1991). According to defendant, the State failed to do so and there is a real probability of contamination.

¶ 59    Defendant erroneously identifies the gunshot residue found on the jeans as the evidence for which the State must lay a foundation. Citing *Winters*, he compares gunshot residue to a vial of blood. The *Winters* court determined that a vial of blood was inadmissible when it was not sealed by the physician who purportedly collected it from the decedent, and an analyst at the crime laboratory testified that it arrived in an unsealed condition. *Winters*, 97 Ill. App 3d at 295-96. *Winters* is distinguishable from this case. The vial of blood collected in *Winters* was collected and stored independent of any other evidence. Here, the police collected defendant's blue jeans as

potential evidence, and later discovered gunshot residue on those blue jeans. The record shows that the State laid a proper foundation for the blue jeans, and defendant does not argue to the contrary. Instead, defendant attempts to reframe what the evidence was, stating that it was the gunshot residue, not the blue jeans. Defendant cites no relevant authority for this position. Defendant further argues that this "situation is akin to emptying a bag of narcotics onto the floor of the police station, sweeping the floor, and then testing the accumulated debris for the presence of a controlled substance." Defendant's unpersuasive argument misses the mark.

¶ 60    The parties cite no Illinois cases with similar facts and issues, and our research has uncovered no such cases. *United States v. Lee*, 502 F.3d 691 (7th Cir. 2007), however, is instructive on this matter. We take note that the Illinois Rules of Evidence largely mirror the Federal Rules of Evidence regarding the foundation that must be laid for expert witness testimony (compare Ill. R. Evid. 703, 705 (eff. Jan. 1, 2011) with Fed. R. Evid. 703, 705). *Simmons*, 2016 IL App (1st) 131300, ¶ 129 n.2. Accordingly, we find an interpretation of the federal rules persuasive, even if it is not binding.

¶ 61    The defendant in *Lee* was arrested by the Rockford Police Department and was found guilty by a federal jury in Rockford of being a felon in possession of a firearm. *Lee*, 502 F.3d at 695. The government presented evidence of gunshot residue on the cuff of the defendant's jacket that he was wearing at the time of his arrest. *Lee*, 502 F.3d at 695. On appeal, the defendant argued that the testimony of the government's gunshot residue expert was unreliable because the government failed to prevent potential contamination of the jacket by maintaining a proper chain of custody. *Lee*, 502 F.3d at 697.

¶ 62    Following the defendant's arrest, his jacket, along with all of his other personal belongings, were placed in a cloth property bag at the Winnebago County Jail. The property bags were reused

from one inmate to the next without being sterilized or laundered between each use. *Lee*, 502 F.3d at 697. The defendant's jacket was later removed from the property bag and placed in a sealed evidence bag and transferred to the Illinois State Police to be tested for gunshot residue. *Lee*, 502 F.3d at 697. The defendant objected to the jacket's admission at trial, arguing that it was potentially contaminated when placed in the unlaundered property bag and commingled with his other belongings. *Lee*, 502 F.3d at 697. The *Lee* court held that the defendant's arguments regarding chain of custody and potential contamination went to the weight of the evidence, not its admissibility. *Lee*, 502 F.3d at 698. Further, the *Lee* court noted that the defendant's lawyer was permitted to cross-examine the expert regarding potential contamination resulting from the collection procedures, and to argue those points to the jury. *Lee*, 502 F.3d at 698.

¶ 63 Here, following defendant's arrest, his clothes were first placed on the floor of the holding cell where other inmates who were also tested for gunshot residue had been kept in the past. Each item of clothing was then placed into a single evidence bag before eventually being separated into individual evidence bags and sent to the Illinois State Police for testing. Like in *Lee*, defendant objected at trial to the admissibility of the evidence on which the gunshot residue was discovered, challenging the chain-of-custody and emphasizing the potential contamination. Also like in *Lee*, defense counsel in this case was permitted to cross-examine Chapman and the police officers on the collection procedures as well as the potential for cross-contamination, and to use that information in his closing argument. The potential contamination went to the weight of Chapman's testimony, not its admissibility, and the weight was a matter properly left to the jury. Thus, the trial court did not abuse its discretion by finding that there was sufficient foundation as to Chapman's findings and opinions, and allowing her to testify on that basis.

¶ 64 2. *Relevance of Expert's Testimony*

¶ 65    We turn now to defendant's relevancy argument regarding Chapman's testimony. Without explicitly stating as much, defendant is essentially arguing that Chapman's testimony should have been excluded because its prejudicial effect outweighed its probative value. See *People v. King*, 2020 IL 123926, ¶ 35 ("In addressing the admission of expert testimony, the trial court should balance the probative value of the evidence against its prejudicial effect ***."). Defendant contends that Chapman's findings had little  or no probative value because she only testified that the blue jeans contacted a gunshot-residue-related item or were in the environment of a discharged firearm, and that she "had no way of knowing whether the particles were from contamination or from actual exposure to gunfire." Defendant then argues that, despite the low probative value of Chapman's testimony, it was nevertheless prejudicial because it allowed the State to argue that the gunshot residue may have been deposited on him in the process of firing a gun. As noted above, we will not overturn the trial court's decision to admit evidence absent an abuse of discretion. *King*, 2020 IL 123926, ¶ 35.

¶ 66    Chapman testified as to her methods, findings, and conclusions regarding five separate items that she tested, including the blue jeans. She testified to her conclusion that, to a reasonable degree of scientific certainty, the blue jeans "contacted a gunshot residue item or [were] in the environment of a discharged firearm." These conclusions are entirely consistent with well-established conclusions regarding positive tests for gunshot residue. See *People v. Meyers*, 2018 IL App (1st) 140891, ¶ 15 (three potential conclusions of a positive test for gunshot residue are that the person (1) discharged a firearm, (2) contacted an item that had gunshot residue on it, or (3) was in the environment of a discharged firearm); *People v. Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 20 (positive test showed that defendant (1) came into contact with a recently fired weapon, or (2) was standing within three feet of a weapon when it was fired); *People v. Gonzalez*,

388 Ill. App. 3d 566, 572 (2008) (positive test for gunshot residue indicated that the subject may have (1) discharged a firearm, (2) contacted a gunshot residue particle, or (3) received the particles from an environmental source); *People v. Raines*, 354 Ill. App. 3d 209, 214-15 (2004) (presence of gunshot residue particles indicated that the defendant (1) discharged a firearm, (2) came in contact with a gunshot-residue-related item, or (3) was in the vicinity of a discharged firearm).

¶ 67    Defendant has cited no authority whatsoever indicating that a gunshot residue expert must be able to testify as to whether the gunshot residue particles came from contamination or from actual exposure to gunfire.  Our research indicates that gunshot residue experts generally do not testify with certainty as to how the gunshot residue particles came to be on the tested evidence. Instead, the experts testify as to the existence of the residue and the potential sources, which generally are that the subject (1) discharged a firearm, (2) contacted an item that had gunshot residue particles on it, or (3) was in the vicinity of a discharged firearm.  The State introduced the gunshot residue testimony to corroborate the identifications of defendant by Becknell and Dauel. In that regard, Chapman's testimony was clearly probative and did not unfairly prejudice defendant.  See *United States v. Stafford*, 721 F.3d 380, 395 (2013) (gunshot residue testimony was probative and not unfairly prejudicial when it was used to corroborate an eyewitness' account). Any potential contamination of the evidence went to the weight of Chapman's testimony, not its admissibility.  See *Lee*, 502 F.3d at 698.

¶ 68    Therefore, the trial court did not abuse its discretion by admitting the expert's testimony. The State established a proper foundation the testimony, and the evidence was not more prejudicial than probative.

¶ 69                                C. Sufficiency of the Evidence

¶ 70    Defendant maintains that Becknell's and Dauel's identifications were "faulty" and that the police mishandled his blue jeans containing the gunshot residue. He thus concludes that the evidence was not sufficient to prove him guilty beyond a reasonable doubt. The State responds that the evidence was sufficient to convict defendant of aggravated battery with a firearm where he was positively identified as the shooter by two eyewitnesses and physical evidence suggested that he may have fired a gun.

¶ 71    When a defendant challenges the sufficiency of the evidence presented against him, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v. Harris*, 2018 IL 121932, ¶ 26. It is for the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *Harris*, 2018 IL 121932, ¶ 26. It is not the function of the reviewing court to retry the defendant, and it must draw *all* reasonable inferences in favor of the State. *Harris*, 2018 IL 121932, ¶ 26. A conviction will not be reversed on appeal unless the evidence is so improbable or unsatisfactory that reasonable doubt as to defendant's guilt remains. *Harris*, 2018 IL 121932, ¶ 26.

¶ 72    In this case, there was ample evidence establishing that defendant was the person who shot Becknell in the early morning hours of October 18, 2015. Police first encountered defendant when he was attempting to enter an apartment connected to the shooting. The bullet removed from Becknell was matched to the gun found near the scene of the crime on the same day as the shooting. Dauel identified defendant as the shooter at a properly conducted show-up procedure only minutes after the shooting. Becknell and Dauel both made positive in-court identifications of defendant as the shooter. The evidence indicated that both Becknell and Dauel had unobstructed and reasonably

well-lit views of the shooter. The shooter was screaming and cursing at Becknell from only a few feet away, which caused both men to focus their attention on the shooter. Becknell and Dauel gave descriptions of the shooter to the 9-1-1 dispatcher and police in the immediate aftermath of the shooting; while there were minor inconsistencies with their descriptions, they were sufficiently consistent to identify defendant.

¶ 73    In addition to the in-court identifications, Chapman's testimony regarding gunshot residue particles on defendant's blue jeans permitted a reasonable inference that defendant may have fired a gun. Moreover, Chapman testified that she found one gunshot residue particle on defendant's right hand and one gunshot residue particle on his t-shirt. The Illinois State Police policy did not permit Chapman to make a positive identification as to the presence of gunshot residue on defendant's hand or shirt based upon one gunshot residue particle, but the jury nonetheless heard about these findings. This properly admitted gunshot residue testimony corroborated the identifications of defendant as the shooter.

¶ 74    Defendant mainly repeats the arguments he made in challenging the validity of the identifications and the gunshot residue testimony. He argues, contrary to the evidence, that neither Becknell nor Dauel "had much of an opportunity to view the suspect." Defendant contends that Becknell's focus was on lowering the Lincoln from the tow truck while the shooter was present, even though Becknell testified that he had already lowered and unhooked the Lincoln before the shooter arrived. Defendant argues that there was no "natural lighting," apparently insinuating that vehicle lights and streetlamps are unreliable sources of lighting. Defendant additionally argues that the presence of gunshot residue particles on his jeans was "almost meaningless," given that the expert could not explain how the particles got on the jeans. He also argues that the presence of another person's fingerprints on the gun's magazine, that the Lincoln was driven away

"presumably by either the shooter or the female," and that another compatible magazine was found in a different apartment all "suggest that someone other than [defendant] committed the offense." Defendant argues that it would be illogical for him to remain in the area if he were the shooter, and thus, neither evidence nor logic support his conviction.

¶ 75    In contending that the identifications, gunshot residue evidence, and other ancillary evidence were all weighed incorrectly, defendant essentially asks us to retry his case on appeal, which is not the function of this court. *Harris*, 2018 IL 121932, ¶ 26. Here, a rational trier of fact could have reasonably concluded from the evidence that defendant fired the bullet that struck Becknell in his left clavicle. Consequently, the evidence is sufficient to prove defendant guilty beyond a reasonable doubt of aggravated battery with a firearm.

¶ 76                                    D. *Prim* Instruction

¶ 77    Defendant argues that the trial court abused its discretion by *sua sponte* giving the jury a supplemental instruction originally taken from *People v. Prim*, 53 Ill. 2d 62, 75-76 (1972), when there was no indication that the jury could not reach a verdict. Defendant concedes that he failed to preserve this issue by objecting to the instruction at trial or in a posttrial motion, but asserts that we should overlook the forfeiture and review the issue under the plain-error doctrine.

¶ 78    The plain-error doctrine bypasses the ordinary forfeiture principles by allowing a reviewing court to consider an unpreserved error when (1) "the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). The first step in any plain-error analysis is to determine whether error occurred, because absent reversible error, there can be no plain error. *People v. McDonald*, 2016 IL 118882, ¶ 48.

¶ 79    The incident that defendant argues is error began when the trial court convened all parties while the jury was still deliberating. The court noted that it was just before 8 p.m., and that the jury had been deliberating for more than eight hours. The court further noted that this trial had 20 witnesses, that some of their testimony came in through stipulation, and that a significant portion of the evidence was "not really contested." The court expressed that it thought eight hours was a significant time to deliberate in this case, even though there had been no indication from the jury that they were deadlocked. The court then cited *People v. Preston*, 76 Ill. 2d 274, 284 (1979), where our supreme court held that, when deciding whether to give a supplemental instruction, a trial court need not wait until it receives direct notice from the jury that it is deadlocked: "[I]t is sufficient if the court can perceive that the jury is having difficulty in reaching a verdict."

¶ 80    The court then made the following statement:

"As indicated, I think this is a significant time to deliberate. I'm not finding anything at this point. I'm just making a clear record that *I do perceive that there might be some difficulty in reaching a verdict*. And again, as I indicated, I have not heard that they are deadlocked.

What I intend to do is this: I'm going to call the jury in. I'm going to ask them if they believe they can reach a verdict. The case law is pretty clear on this. You can't ask a numerical division, you can't ask which side it favors, you can't ask any of that. I would just ask that simple question, whether they can reach a verdict.

Whatever their answer is, I'm going to read them 26.07 of the Illinois Pattern Jury Instructions. I'll read that into the record now.

'The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.'

***

So I'm going to read them that instruction, then I'm going to instruct them to continue to deliberate and send them back to the jury deliberation room.

I'm going to give them an hour. We'll see what happens after an hour. That would take us to 9:00. That's over nine hours of deliberation.

The Supreme Court Rule 436 allows the Court to send the jury home and bring them back in the morning. I haven't decided about that yet. Obviously, the options are if at 9:00 they haven't reached a verdict, I could hang them, hang the jury and declare a mistrial, or I could break the jury and send them home and bring them back in the morning. I could do either one of those.

But what I would like to do now is I'm going to start with the State. If you want to make a record of anything, State, state what you think would be the way that you think we should do this or object to the way I am doing it, however you want, I'll let you make a record, whatever you want.

[Assistant State's Attorney]: Judge, we have no position.

The Court: Counsel?

[Defense attorney]: No position." (Emphasis and internal quotation marks added.)

¶ 81     The court brought the jury into the courtroom and asked the foreperson whether she believed that the jury could reach a verdict, to which the foreperson replied: "Yes." The court then read Illinois Pattern Jury Instructions, Criminal, No. 26.07 (approved July 18, 2014) (hereinafter IPI Criminal No. 26.07) (quoted above) to the jury, after which it sent the jury back to continue deliberating. The jury returned some time before 9 p.m. with a guilty verdict on the single count in the indictment.

¶ 82     Defendant argues that the trial court abused its discretion, and thereby committed reversible error, by *sua sponte* giving the jury this "premature and coercive" *Prim* instruction, which "likely hastened a verdict" when there was no indication that the jury could not reach a verdict. Defendant further argues that we should review this alleged error under both prongs of the plain-error doctrine because this case was closely balanced and the error was serious. The State responds that the *Prim* instruction was not given in error, so there can be no plain error.

¶ 83     As discussed above, the first step in any plain-error analysis is to determine whether error occurred. Defendant's entire argument for error is contained in a single paragraph where he cites *People v. Jackson*, 26 Ill. App. 3d 618 (1975), to support his contentions the *Prim* instruction was premature, coercive, and likely hastened the verdict. In *Jackson*, the jury was brought into court

after ten hours of deliberation and the court asked the foreman if he thought the jury might be able to arrive at a verdict, to which he responded: "Yes, sir, I do." *Jackson*, 26 Ill. App. 3d at 630. Over the defendant's objection, the court then gave a supplemental instruction similar to an instruction given in *Prim*, but not the same language later codified in IPI Criminal No. 26.07 that was given in the present case. The *Jackson* court's instruction read in part:

> "It is your duty to decide the case if you can conscientiously do so. If you should fail to agree on a verdict the case must be retried and a future jury must be selected in the same manner and from the same source as you have been chosen. And there is no reason to believe that the case would ever be submitted to twelve men and women more competent to decide. Nor can the case be tried any better or more exhaustively than it has been here or that more clear evidence could be produced on behalf of either side." *Jackson*, 26 Ill. App. 3d at 630.

¶ 84    The appellate court in *Jackson* noted that this language was similar to that found in *Prim*, and held that the instruction was premature under the circumstances where the jury had given no indication that it was deadlocked. *Jackson*, 26 Ill. App. 3d at 630-31. On its face, *Jackson* might appear to support defendant's argument, but the language of the instruction given in *Jackson* is materially different than the language quoted verbatim by the trial court here from IPI Criminal No. 26.07. Our supreme court ordered all trial courts in Illinois to use the language from *Prim* that was ultimately codified in IPI Criminal No. 26.07, commenting that it was attempting to provide guidance to juries while avoiding the coercive dangers inherent in supplemental instructions. *Prim*, 53 Ill. 2d at 74-77. While it is true that the language used by the trial court in *Jackson* was borrowed directly from *Prim* (*Prim*, 53 Ill. 2d at 72), it is also true that our supreme court was critical of that particular part of the trial court's instruction in *Prim*:

"[W]e believe that all of the instruction following the words 'It is your duty to decide the case if you can conscientiously do so,' is not helpful to a jury reaching a verdict. In fact, telling a jury that if they fail to agree on a verdict the case must be retried is not correct." *Prim*, 53 Ill. 2d at 76-77.

Because the trial court in *Jackson* gave a materially different supplemental instruction that had been specifically criticized by our supreme court, we find *Jackson* to be distinguishable from the present case.

¶ 85    *Jackson* is not only distinguishable, but it is also inapposite. Four years after the appellate court decision in *Jackson* held that a supplemental instruction given before any indication of a deadlocked jury was inappropriate, our supreme court rejected a similar argument after a trial court delivered a similar supplemental instruction in *Preston*. After 6 ½ hours of deliberation, with no indication of a deadlocked jury, the trial court informed counsel that it intended to give the jury a supplemental instruction. *Preston*, 76 Ill. 2d at 278. After the foreman told the court that he could not say at the moment whether the jury could reach a verdict, and over defendant's objection, the trial court delivered the supplemental instruction and sent the jury back to continue deliberating. *Preston*, 76 Ill. 2d at 279. Our supreme court considered the propriety of that supplemental instruction:

"The defendant contends first that delivery of the instruction was premature since the jury was not known to be deadlocked. We reject that contention. In determining how long a jury should be permitted to deliberate before a mistrial is declared and the jury is discharged, no fixed time can be prescribed, and great latitude must be accorded to the trial court in the exercise of its informed discretion. [Citations.] For similar reasons *it is primarily the function of the trial court to determine, on the basis of such factors as the*

- 35 -

*length of time already spent in deliberation and the complexity of the issues before the jury,*

*when the giving of a supplemental instruction becomes appropriate*." (Emphasis added.)

*Preston*, 76 Ill. 2d at 283-84.

Our supreme court went on to reason that trial courts are not required to wait for a statement from the jury that it could not reach a verdict; it is enough if the trial court "can perceive that the jury is having difficulty in reaching a verdict." *Preston*, 76 Ill. 2d at 284. Here, the trial court unequivocally stated on the record that it had considered the amount of time spent in deliberation as well as the quantity and complexity of the evidence, adding: "I'm just making a clear record that I do perceive that there might be some difficulty in reaching a verdict."

¶ 86    Following *Preston*, our supreme court has reiterated that trial courts have wide discretion in determining if and when to give a supplemental instruction. See *People v. Cowan*, 105 Ill. 2d 324, 328 (1985) ("The time when a supplemental instruction should be given is for the court to decide."); *People v. Chapman*, 194 Ill. 2d 186, 222 (2000) ("It is up to the trial court's discretion whether to give such an instruction and, if so, when to give the instruction."); *People v. Roberts*, 214 Ill. 2d 106, 121 (2005) ("Matters relating to jury selection and management are generally within the discretion of the trial court) (citing *Chapman*, 194 Ill. 2d at 222); *People v. Kimble*, 2019 IL 122830, ¶ 46 (it is within the trial court's discretion to determine if a supplemental instruction should be given because it is in the best position to decide whether such an instruction would be helpful or coercive). Defendant asserts that the supplemental instruction was premature because the jury was not deadlocked. He offers nothing beyond conclusory statements, however, that would explain why the trial court's decision to give this instruction was an abuse of discretion, particularly in light of this robust body of case law that confers such broad discretion on the trial court, whether or not a jury is deadlocked. Consequently, defendant has failed to demonstrate

error, and we will not overlook the principles of forfeiture by invoking the plain-error exception. *People v. Wade*, 131 Ill. 2d 370, 376 ("Before invoking the plain-error exception, it is appropriate to determine whether error occurred at all.").

¶ 87                                       III. CONCLUSION

¶ 88     For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 89     Affirmed.